## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

———————————

**REPUBLICAN PARTY OF NEW MEXICO;**
**REPUBLICAN PARTY OF DOÑA ANA COUNTY;**
**REPUBLICAN PARTY OF BERNALILLO COUNTY;**
**RIGHT TO LIFE COMMITTEE OF NEW MEXICO;**
**NEW MEXICO TURN AROUND;**
**HARVEY YATES**; and **JALAPEÑO CORPORATION**,

        Plaintiffs,

    v.                                                                 No. 1:11-cv-00900-WJ-KBM

**RAÚL TORREZ**, in his official capacity, New
Mexico Attorney General; **MAGGIE TOULOUSE
OLIVER**, in her official capacity, New Mexico
Secretary of State; and District Attorneys **SAM
BREGMAN**, **GERALD BYERS**, and **DIANNA
LUCE**, in their official capacities,

        Defendants.[1]

## MEMORANDUM OPINION AND ORDER ACCOMPANYING COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR BENCH TRIAL

    **THIS MATTER** is before the Court on a bench trial on the written record following eleven

years of litigation over the constitutionality of New Mexico's campaign finance laws as codified

in the Campaign Reporting Act, NMSA 1978, § 1-19-26 to -37 (2019). Having reviewed the

extensive record, the parties' proposed findings of fact and conclusions of law (**Docs. 274, 275**),

the parties' closing arguments (**Docs. 281, 282**), and the applicable law, the Court **RULES** in favor

of Plaintiffs on Counts III, IV, and V, the Court **DECLARES** the statutory provisions challenged

———————————

[1] By operation of Federal Rule of Civil Procedure 25(d), Attorney General Torrez and District Attorney Bregman have been automatically substituted into this suit—in their official capacities—in place of their predecessors.

1

therein unconstitutional, and the Court **ENJOINS** Defendants from enforcing the relevant provisions. Plaintiffs' remaining challenges are unavailing; therefore, the Court **DISMISSES with prejudice** Counts I, II, VI, VII, VIII, and IX.

| Counts | Challenge | Disposition |
|--------|-----------|-------------|
| **Count I** | First Amendment challenge to $27,500 limit on contributions from individuals and entities to state political parties | **Dismissed with prejudice** |
| **Count II** | First Amendment challenge to $27,500 limit on contributions from national political parties to state political parties for federal elections | **Dismissed with prejudice** |
| **Count III** | First Amendment challenge to $5,500 limit on contributions from state political parties to county political parties | **Declared unconstitutional** |
| **Count IV** | First Amendment challenge to $5,500 limit on contributions from state political parties to nongubernatorial candidates or candidate committees | **Declared unconstitutional** |
| **Count V** | First Amendment challenge to $11,000 limit on contributions from state political parties to gubernatorial candidates or candidate committees | **Declared unconstitutional** |
| **Count VI** | First Amendment challenge to "Appeal to Vote" definition of "Independent Expenditure" for contribution disclosure and registration purposes | **Dismissed with prejudice** |
| **Count VII** | First Amendment challenge to "Electioneering Communication" definition of "Independent Expenditure" for contribution disclosure and registration purposes | **Dismissed with prejudice** |
| **Count VIII** | First Amendment challenge to regulatory definition of "Expressly Advocate" for contribution disclosure and registration purposes | **Dismissed with prejudice** |
| **Count IX** | First Amendment challenge to limit on contributions from individuals and other entities to political committees for "Independent Election Activities" | **Dismissed with prejudice** |

## BACKGROUND

New Mexico enacted the Campaign Reporting Act in 2009. NMSA 1978, 1-19-26 to -37 (2009). The Campaign Reporting Act ("CRA") placed limits on political campaign contributions. The CRA was enacted in response to political corruption scandals in New Mexico and in the wake of a 2006 Task Force on Ethics Reform convened by former Governor Bill Richardson. The Task Force recommended New Mexico establish campaign contribution limits and strengthen contribution reporting requirements as one way of reforming the State's ethics and campaign finance laws. **Doc. 261-10 at 7**. Contribution limits were recommended in part because at the time New Mexico was one of only thirteen states with no contribution limits. *Id.* **at 15**. The recommended contribution limits aimed to address *quid pro quo* corruption and the appearance of corruption associated with large campaign contributions. **Doc. 242-1 at 4, 7–8** (Bluestone Dep. at 18:23–19:12; 37:16–40:1). Several high-profile New Mexico corruption scandals also influenced the Task Force's recommendation and the ultimate adoption of contribution limits. *Id.* **at 10** (*id.* at 51:19–52:9).

One of these scandals, ironically, involved Governor Bill Richardson—the one who convened the 2006 Ethics Task Force in the first place. Richardson came under federal investigation in 2008 for allegedly giving state contracts to campaign donors. And these pay-to-play allegations ultimately caused Richardson to withdraw from consideration as President Obama's Commerce Secretary. **Doc. 122-6** (S. Stolberg, "Richardson Won't Pursue Cabinet Post," N.Y. TIMES, Jan. 5, 2009); **Doc. 122-7** (Frosch & McKinley, Jr., "Political Donor's Contracts Under Scrutiny in New Mexico," N.Y. TIMES, Dec. 18, 2008). The scandal surrounding Governor Richardson brought New Mexico into the national spotlight during the same time the New Mexico

3

legislature was debating contribution limits. *See e.g.*, **Doc. 122-3** (B. Marsh, "Illinois Is Trying. It Really Is. But the Most Corrupt State Is Actually. . . ," N.Y. TIMES, Dec. 13, 2008); **Doc. 122-5** (S. Simon, "New Mexico's Political Wild West," WALL ST. J., Jan. 17, 2009); **Doc. 122-4** (McKinley, Jr. & Haederle, "Inquiry Highlights New Mexico's Few Ethics Laws," N.Y. TIMES, Jan. 10, 2009).

However, Governor Richardson's corruption scandal was not the first in New Mexico's history. Since statehood in 1912, political corruption has plagued New Mexico. The corruption of the Santa Fe Ring reportedly delayed New Mexico's admission to the Union. David L. Caffey, CHASING THE SANTA FE RING: POWER AND PRIVILEGE IN TERRITORIAL NEW MEXICO 184–85 (Univ. N.M. Press, 2014). And not long after New Mexico became a state, Albert Fall—former New Mexico Senator and then Secretary of the Interior—was jailed for accepting bribes in exchange for federal petroleum reserve leases in the Teapot Dome scandal. Jake Kobrick, *United States v. Albert B. Fall: The Teapot Dome Scandal*, Federal Judicial Center (2020), https://www.fjc.gov/sites/default/files/trials/Teapot%20Dome_1.pdf.

Political corruption in not just a relic of New Mexico's past. In the 1980s, New Mexico State Investment Officer Philip Troutman and Deputy State Treasurer Kenneth Johnson were convicted of conspiracy to commit extortion for soliciting $2,000 in contributions to the Democratic Leadership Fund. *United States v. Troutman*, 814 F.2d 1428 (10th Cir. 1987). Then, in the 1990s, New Mexico State Representative Ronald Olguin was convicted for soliciting or demanding a $15,000 bribe in exchange for including a $100,000 appropriation in the House's appropriation bill. *State v. Olguin*, 1994-NMCA-050, ¶¶ 15-21, 879 P.2d 92, *set aside on other grounds*, 1995-NMSC-077, 906 P.2d 731. And not long before CRA's enactment, two New Mexico state treasurers, Michael Montoya and Robert Vigil, were convicted of extortion and

4

attempted extortion. *United States v. Vigil*, 506 F. Supp. 2d 544, 547–550 (D.N.M. 2007); *United States v. Vigil*, 523 F.3d 1258, 1261–62 (10th Cir. 2008).

And so, with corruption in the air, New Mexico State Senator Dede Feldman sponsored Senate Bill 116, which would become the CRA. Senator Feldman testified the bill's contribution limits were intended to address an "atmosphere of corruption" in the State, including polling data showing the public believed "politicians were bought by special interests and campaign contributions and [that] they were corrupt." **Doc. 122-15 at 2, 5** (Feldman Dep. at 12:23–13:12; 46:11–24). Senator Feldman also testified to witnessing *quid pro quo* corruption firsthand. According to Senator Feldman, pharmaceutical lobbyists handed campaign contributions out to the committee members—including Senator Feldman—in the legislative chamber right before a vote on prescription drug prices during a Health and Human Services Committee hearing. *Id.* at 4 (*Id.* at 33:14–35:14). In her book, Senator Feldman also described a fireworks bill being tabled after industry lobbyists made contributions to legislative committee members considering the bill. **Doc. 261-5 at 7** (Dede Feldman, Inside the New Mexico Senate: Boots, Suits, and Citizens Ch. 5 (Univ. N.M. Press 2014)).

Senate Bill 116—soon to be the CRA—worked its way through the New Mexico legislature and onto the Governor's desk. And in 2009 New Mexico enacted the CRA, imposing campaign contribution limits in the State for the first time. Not long after, the United States Supreme Court decided the seminal case *Citizens United v. FEC*, 558 U.S. 310 (2010), which injected uncertainty into the world of campaign finance. Seizing on this uncertainty, the Republican Party of New Mexico ("NMGOP") and other plaintiffs (collectively "Plaintiffs")[2] filed

---

[2] The remaining plaintiffs include the Republican Party of Bernalillo County, the Republican Party of Doña Ana County, New Mexico Turn Around, Mr. Harvey Yates, Jalapeño Corporation, and the Right to Life Committee of New Mexico.

suit in 2011, challenging the CRA under the Supremacy Clause, Section 1983, and the First and Fourteenth Amendments of the United States Constitution. Plaintiffs sought declaratory and injunctive relief against government officials with the power to enforce CRA, namely the Attorney General, Secretary of State, and three District Attorneys (collectively "New Mexico" or "the State").

Over the past eleven years, the terrain of the litigation has changed as have Plaintiffs' claims. Shortly after filing the initial complaint, Plaintiffs sought a preliminary injunction. **Docs. 9, 10**. In 2012, the Court ruled in Plaintiffs' favor and enjoined two applications of the CRA's contribution limits: First, the Court held that under *Citizens United* the State could not limit independent-expenditure contributions to two political action committees ("PACs") then involved in the litigation. *Republican Party of N.M. v. King*, 850 F. Supp. 2d 1206, 1214–15 (D.N.M 2012). The Court also held the State could not limit federal-election-fund contributions from national to state parties. *Id.* at 1215–16. But the Court refused to enjoin the State on Plaintiffs' other claims. *Id.* The State appealed, and the Tenth Circuit affirmed the preliminary injunction barring the enforcement of the CRA's limits as applied to the independent-expenditure contributions to the two PACs. *Republican Party of N.M. v. King*, 741 F.3d 1089, 1103 (10th Cir. 2013). On remand, this Court stayed the case for several years to await the resolution of *McCutcheon v. FEC*, 572 U.S. 185 (2014), and *Republican National Committee v. FEC*, No.14-00853 (D.D.C. filed May 23, 2014). **Docs. 59, 63**. The Court lifted the stays at the end of 2017, and the parties proceeded to conduct discovery and file pretrial motions. **Doc. 103**.

In 2019, New Mexico amended the CRA. NMSA 1978, § 1-19-25 to -36 (2019). The amendment changed many of the CRA's contribution limits and eliminated the limits on independent expenditures. The changes rendered moot Plaintiffs' challenge to limits on

independent-expenditure contributions and altered the statutory landscape underlying Plaintiffs' challenges. In response, Plaintiffs amended their Complaint in 2020. **Doc. 160.** The operative Third Amended Complaint includes constitutional challenges to the CRA's limit on contributions from individuals and entities to state political parties **(Count I)**; contributions from national political parties to state political parties **(Count II)**; contributions from state political parties to county political parties **(Count III)**; contributions from state political parties to nongubernatorial candidates or candidate committees **(Count IV)**; contributions from state political parties to gubernatorial candidates or candidate committees **(Count V)**; and contributions from individuals and other entities to political committees for Independent Election Activities **(Count IX)**. Plaintiffs also challenge two of CRA's definitions of "Independent Expenditure" **(Counts VI, VII)**, and the regulatory definition of "Expressly Advocate" **(Count VIII)** as unconstitutionally vague and overbroad. The Court addresses each challenge in turn, beginning first with Plaintiffs' contribution-limit claims and moving on to Plaintiffs' vagueness and overbreadth challenges.

## DISCUSSION

## I.   Contribution-Limit Challenges: Counts I, II, III, IV, V, and IX

Plaintiffs contend New Mexico's limitations on campaign contributions made to and from political parties are unconstitutional. In Counts I–V and IX, Plaintiffs challenge the following limits, which adjust with inflation and are per election cycle:

**Count I:**  $27,500 limit on contributions from individuals, entities, or political committees to state political parties.

**Count II:**  $27,500 limit on federal-election contributions from national to state political parties.

**Count III:** $5,500 limit on contributions from state to county political parties.

**Count IV:** $5,500 limit on contributions from state political parties to nongubernatorial candidates or candidate committees.

7

**Count V:** $11,000 limit on contributions from state political parties to gubernatorial candidates or candidate committees.

**Count IX:** Limits on contributions to political committees for Independent Election Activities.

The State contends Plaintiffs lack standing to bring Counts II, IV–VIII, and IX. **Doc. 282 at 6–12.** The State has already raised the issue of standing in a cross-motion for summary judgment. **Doc. 242**. For the same reasons the Court denied the State's motion for summary judgment, **Doc. 256**, the Court rejects the State's contentions that Plaintiffs still lack standing.

## A.   Plaintiffs' Contribution-Limit Challenges Are Facial, Not As-Applied.

As a threshold matter, Plaintiffs bring facial, not as-applied, challenges to the CRA's contribution limits. A facial challenge attacks a statute head-on, asserting that the challenged statute "violates the Constitution in all, or virtually all, of its applications." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (citation omitted). In contrast, an as-applied challenge "concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *Id.* (citation omitted). "[T]he distinction between facial and as-applied challenges . . . . goes to the breadth of the remedy employed by the Court." *Citizens United*, 558 U.S. at 331.

Constitutional challenges can "occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation." *Supreme Ct. of New Mexico*, 839 F.3d at 908. For example, a challenge can be as-applied in the sense that it focusses on a statute's application to "a specific, narrowly defined group" and facial in that it is not limited to the plaintiffs' particular case but challenges application of the law more broadly. *Id.* When a claim falls in this middle ground, the Court must "determine which analytical construct—facial or as-applied—is the appropriate one." *Id.* at 912. To make this determination, the Court considers three guiding principles:

> **[F]irst**, the labels the parties attach to claims are not determinative; **second**, in determining whether to apply facial standards to the claim, importantly, the court must focus on whether the claim and the relief therein extend beyond the plaintiffs' particular circumstances; and **third**, if the claim and relief do so, facial standards are applied but only to the universe of applications contemplated by plaintiffs' claim, not to all conceivable applications contemplated by the challenged provision.

*Id.* at 914 (bold added). Here, Plaintiffs' challenges have characteristics of both as-applied and facial challenges. Still, a facial standard should be applied because the relief Plaintiffs seek extends beyond Plaintiffs' particular case. Thus, the Court will apply a facial standard but limit the scope of its analysis to the discrete universe of applications contemplated by Plaintiffs' claims.

Plaintiffs who bring facial constitutional challenges normally must establish that (1) "no set of circumstances exists under which the [statute] would be valid," or (2) the statute lacks "a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citation omitted). But in practice the Supreme Court does not require facial First Amendment challengers to show either; instead, the Supreme Court "has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) (collecting cases). For example, in *Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008), the Supreme Court facially struck down provisions of the Bipartisan Campaign Reform Act ("BCRA") by applying heightened scrutiny to the First Amendment claims without asking whether any set of circumstances existed under which the provisions would be valid. And in *Citizens United v. FEC*, 558 U.S. 310 (2010), the Supreme Court again facially struck down provisions of the BCRA on First Amendment grounds without any inquiry into potential circumstances under which the provisions would be valid.

This Supreme Court trend prompted the Tenth Circuit to conclude the no-set-of-circumstances standard should not be viewed "as setting forth a *test* for facial challenges, but rather as describing the *result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard." *Supreme Ct. of New Mexico*, 839 F.3d at 917 (citation omitted). "In other words, where a statute fails the relevant constitutional test . . . it can no longer be constitutionally applied to anyone—and thus there is 'no set of circumstances' in which the statute would be valid." *Id.* (citation omitted). Guided by Tenth Circuit and Supreme Court precedent, the Court analyzes Plaintiffs' facial claims under the relevant constitutional tests—not by asking whether no set of circumstances exist under which the challenged law would be valid.[3] But while applying the relevant constitutional test, the Court remains mindful that facial challenges are disfavored. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).

**B.      When and to What Extent Can a State Limit Campaign Contributions?**

"The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). Since *Buckley v. Valeo*, the Supreme Court has repeatedly held the State may limit campaign contributions if the State demonstrates (1) "a sufficiently important interest" and (2) "employs means closely drawn to avoid unnecessary abridgment of associational freedoms." 424 U.S. 1, 25 (1976). When faced with a First-Amendment contribution-limit challenge, the State bears the burden of showing the law's constitutionality. *McCutcheon*, 572 U.S. at 210.

---

[3] Although the Tenth Circuit has not yet addressed the plainly-legitimate-sweep standard, the Court concludes the Tenth Circuit's reasoning applies equally to this standard; thus, a statute's lack of "plainly legitimate sweep" describes the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard—it does not set forth a test for facial challenges.

1.      **Prong One: What Constitutes a Sufficiently Important Interest?**

For a contribution limit to survive, the State must first show a "sufficiently important interest" in that limit. *Buckley*, 424 U.S. at 25. Supreme Court precedent is "clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." *McConnell v. FEC*, 540 U.S. 93, 143 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. 310. But not just any corruption will suffice. Campaign contribution limits must aim to prevent *quid pro quo* corruption or its appearance. *FEC v. Cruz*, 142 S. Ct. 1638, 1652 (2022).

Plaintiffs urge the Court to go against decades of Supreme Court precedent and hold that prevention of *quid pro quo* corruption cannot justify contribution limits because contribution limits do not in fact reduce corruption or its appearance. Plaintiffs' expert witness Dr. Jeffrey Milyo posits that campaign finance reforms, including contribution limits, are ineffective at reducing *quid pro quo* corruption or its appearance. **Doc. 226-2 at 6–9; Doc. 260-1**.[4] Dr. Milyo's research may well be correct,[5] but whether contribution limits in fact reduce *quid pro quo* corruption is not what the Supreme Court has instructed this Court to consider. The Court considers evidence of *quid pro*

---

[4] Dr. Milyo appears to challenge the idea that contribution limits—regardless of the amount—are effective at preventing *quid pro quo* corruption or its appearance. Dr. Milyo's opinion strikes at the heart of whether the State has shown a sufficiently important interest in contribution limits, but it is not relevant to whether the specific limits enacted by New Mexico's legislature are closely drawn, counter to Plaintiffs' contentions. *See* **Doc. 281 at 22-26**. Thus, the Court addresses Dr. Milyo's report here but does not revisit it in the context of whether the contribution limits are "closely drawn."

[5] Alabama, Indiana, Iowa, Nebraska, North Dakota, Oregon, Pennsylvania, Texas, Utah, and Virginia do not limit the contributions individuals, PACs, or political parties can make. The Court finds it difficult to believe these ten states are significantly more corrupt than the other forty states in the Nation, but whether contribution limits in fact reduce corruption is not a question this Court can answer. It is a question the Court must leave up to state legislatures and the United States Supreme Court.

*quo* corruption *before* limits were enacted to determine whether the limits are justified by a sufficiently important interest in preventing that corruption—the Court does not dig through social science studies conducted in the wake of contribution limits to determine whether they did what they were intended to do. This Court is not the arbiter of social-science debates. Plaintiffs are free to take the actual efficacy of campaign contribution limits up with the Tenth Circuit or maybe even the Supreme Court. However, under current controlling legal precedent, the Supreme Court has held, again and again, that contribution limits can be justified by evidence of *quid pro quo* corruption or its appearance. Thus, the Court will not entertain social-science challenges to underlying assumptions the Supreme Court has relied on since *Buckley v. Valeo*, 424 U.S. 1 (1976).

While the prevention of *quid pro quo* corruption or its appearance is the only permissible grounds for restricting political contributions, *Cruz*, 142 S. Ct. at 1652, the Court does not interpret this requirement to mean that contribution limits must be struck down if there is evidence that a state legislature may have considered implementing contribution limits for other reasons as well. Plaintiffs' contrary reading is unavailing. Plaintiffs appear to argue that if there is evidence a state legislature considered implementing contribution limits for purposes other than preventing *quid pro quo* corruption, then the contribution limits must be struck down. ***See* Doc. 281 at 10–12; Doc. 274 (Pls.' COL No. 150)**. The Court does not read Supreme Court precedent so narrowly. Here, there is evidence that the Task Force considered other reasons for contribution limits—in addition to preventing *quid pro quo* corruption. But as the State points out, "Plaintiffs offer no authority that considering other interests is impermissible where contribution limits also serve a valid, anti-corruption interest." **Doc. 282 at 21**. In fact, the Supreme Court in *Buckley v. Valeo* upheld contribution limits whose "primary purpose" was to prevent "the actuality and appearance of corruption" but that also furthered "ancillary" interests unrelated to combatting *quid pro quo*

corruption. The Court will not require the State to show that preventing *quid pro quo* corruption or its appearance was the only interest the State considered when enacting the challenged contribution limits.

The Supreme Court defines *quid pro quo* corruption as "a direct exchange of an official act for money" or "dollars for political favors." *McCutcheon*, 572 U.S. at 192. "[M]ere political favoritism or opportunity for influence alone is insufficient." *McConnell*, 540 U.S. at 153. The Supreme Court also permits contribution limits to prevent the appearance of *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 207. The Supreme Court has described the appearance of corruption as "stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" to candidates. *Id.* (citation omitted). The appearance of *quid pro quo* corruption is of "almost equal concern as the danger of actual quid pro quo arrangements." *Buckley*, 424 U.S. at 27. This is because the appearance of corruption risks "the eroding of public confidence in the electoral process." *McConnell*, 540 U.S. at 136.

Plaintiffs urge the Court to adopt their definitions of *quid pro quo* corruption and its appearance. **Doc. 281 at 3–7**. According to Plaintiffs' reading of Supreme Court precedent, *quid pro quo* corruption is properly understood as "an unambiguous and improper agreement for a direct exchange of something of value for an official act contrary to the obligations of the office." **Id. at 3–4**. The Court is not persuaded to adopt a novel definition of *quid pro quo* corruption when the Supreme Court has already provided clear and concise definitions. Nor will the Court accept Plaintiffs' invitation to narrow the definition of the appearance of *quid pro quo* corruption to "impactful public awareness of *actual* [*quid pro quo*] corruption or probable, non-speculative, opportunities for [the] same." **Id. at 7**. The Court agrees with Plaintiffs that the appearance of *quid pro quo* corruption requires "public awareness of the opportunities for" *quid pro quo* corruption,

*McCutcheon*, 572 U.S. at 207, but the Court does not agree that it requires "impactful" public awareness of "actual" *quid pro quo* corruption, **doc. 281 at 7**. The Court will stick to the definitions clearly provided by the Supreme Court rather than compiling a heightened standard from snippets of caselaw cited by Plaintiffs.

In addition to a state's interest in preventing *quid pro quo* corruption, the Supreme Court has also upheld contribution limits based on the government's interest in preventing circumvention of other valid contribution limits. *FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 445, 456 (2001) ("*Colorado II*") ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption."); *McConnell*, 540 U.S. at 144 ("[T]hese interests have been sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits.").

To show a sufficiently important interest, the State must point to "record evidence or legislative findings" demonstrating the need to address circumvention or *quid pro quo* corruption or its appearance by implementing contribution limits in a particular "context." *Cruz*, 142 S. Ct. at 1653. The parties disagree on whether the State must present evidence of *quid pro quo* corruption or its appearance in the context of each contribution limit. Plaintiffs maintain the State must present evidence of corruption pertaining to each specific limit—for example, evidence of *quid pro quo* corruption specific to contributions between state and county parties. ***See* Doc. 281 at 14 n.10**. The State disagrees, arguing "the Court should [not] artificially cabin evidence of corruption and apparent corruption to claims involving the precise scenario of corruption" because "a State may create a holistic campaign finance system designed to avoid loopholes and circumvention." **Doc. 282 at 25**. The Court finds the law supports a finding somewhere in the middle. The Court agrees with the State to the extent that evidence need not involve "the precise scenario of corruption"

targeted by a particular limit. *Id.* Yet, the State does need to show evidence of circumvention or *quid pro quo* corruption or its appearance in the "context" of the challenged limit. *Cruz*, 142 S. Ct. at 1653.

The State can meet its burden by pointing to evidence of a "serious threat" or "risk" of *quid pro quo* corruption or circumvention. *Colorado II*, 533 U.S. at 445, 456, 457. The State need not show completed *quid pro quo* transactions. *Lair v. Motl*, 873 F.3d 1170, 1180 (9th Cir. 2017) ("Montana need not show any completed quid pro quo transactions to satisfy its burden. It simply must show that the risk of actual or perceived quid pro quo corruption is not illusory . . . ."); *see also Citizens United*, 558 U.S. at 357 (explaining contribution limits are allowed as preventative measures even though "few if any contributions to candidates will involve quid pro quo arrangements"). The Court applies a "less rigorous standard of review" to contribution limits to give the legislature "sufficient room to anticipate" *quid pro quo* corruption and circumvention, not just respond to it after the fact. *McConnell*, 540 U.S. at 124.

The amount of evidence the State must bring forward to support its sufficiently important interest "will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 378 (2000); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 386 (5th Cir. 2018) ("When following a well-trodden path, the evidentiary bar is not high . . . ."). But in every case the State must present more than "mere conjecture." *McCutcheon*, 572 U.S. at 210. To shoulder its burden, the State may "rely on evidence from other jurisdictions to justify campaign-finance reforms" where such evidence is reasonably believed to be related to the problems the contribution limits are intended to address. *Homans v. City of Albuquerque*, 366 F.3d 900, 909 (10th Cir. 2004) (citation omitted); *cf. Cruz*, 142 S. Ct. at 1653 (criticizing government for failing to cite any evidence of *quid pro quo* corruption from other

states). The question of whether a sufficiently important interest exists "is divorced from the actual amount of the limits—it is a threshold question whether *any* level of limitation is justified." *Lair*, 873 F.3d at 1178. If the State meets its first-prong burden, then the Court may consider the dollar amount of the contribution limit at issue.

## 2.    Prong Two: When Is a Contribution Limit "Closely Drawn"?

If New Mexico shows a sufficiently important interest in limiting campaign contributions, it still must show the challenged contribution limits are "closely drawn to avoid the unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 191. Plaintiffs urge the Court to find "closely drawn" synonymous with "narrowly tailored." **Doc. 281 at 20**. The Court does not interpret the Supreme Court's use of the language "narrowly tailored to achieve the desired object" in *McCutcheon*, 572 U.S. at 218, as a departure from the well-established "closely drawn" standard. Until the Supreme Court definitively abandons *Buckley*, the Court will continue to analyze whether contribution limits are "closely drawn." To determine whether limits are closely drawn, the Court "must assess the fit between the stated governmental objective and the means selected to achieve that objective." *Id.* at 199. The fit need not be "perfect," the "least restrictive," or "the single best disposition," but it must be "reasonable." *Id.*

When contribution limits are challenged as not closely drawn, the Supreme Court has "extended a measure of deference to the judgment of the legislative body that enacted the law." *Davis*, 554 U.S. at 737. Deference is due in part because the "legislature is better equipped to make such empirical judgments, as legislators have 'particular expertise' in matters related to the costs and nature of running for office." *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (citation omitted). The Supreme Court has emphasized that courts are ill-equipped to "determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives." *Id. See*

*also Buckley*, 424 U.S. at 30 ("[A] court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.") (citation omitted). In short, the Court should ordinarily defer to the legislature's determination of contribution limits. *Randall*, 548 U.S. at 248.

The judiciary's deference to legislative judgment, however, is not boundless. The Courts continue their role of ensuring that the legislature chooses limits not "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Shrink*, 528 U.S. at 397. "[L]imits that are too low cannot stand." *Davis*, 554 U.S. at 737. This is because low limits may reduce democratic accountability "by preventing challengers from mounting effective campaigns against incumbent officeholders." *Randall*, 548 U.S. at 248–49. Limits should not "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Id.* at 248. And limits should not prevent candidates and political committees from "amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21.

In *Randall*, Justice Breyer's plurality opinion laid out a two-part test for whether contribution limits are "closely drawn." 548 U.S. at 248–63. The full Supreme Court has since adopted Justice Breyer's test in *Thompson v. Hebdon*, 140 S. Ct. 348 (2019) (*per curiam*). Justice Breyer's danger-signs test goes like this: Ordinarily the Court should defer to a legislature's judgment. But if the Court identifies "danger signs," then it must "examine the record independently and carefully to determine whether [the] contribution limits are 'closely drawn' to match the State's interest." *Randall*, 548 U.S. at 249. Justice Breyer identified two danger signs that signal contribution limits may fall outside tolerable First Amendment limits: (1) the contribution limits are "substantially lower" than limits previously upheld by the Supreme Court, and (2) the contribution limits are "substantially lower" than comparable limits in other

States. *Id.* at 253. If the Court finds these danger signs, it is compelled to exercise its independent judgment and carefully review the record to see if the limits are closely drawn.

There is no set analysis the Court must conduct when independently reviewing the record. Justice Breyer did provide some guidance on what a court might consider when conducting its independent review. Five "sets of considerations"—or "factors"—led Justice Breyer to conclude that limits statutorily imposed by the Vermont State Legislature were not "closely drawn":

1.  The record suggested contribution limits would "significantly restrict the amount of funding available for challengers to run competitive campaigns."

2.  Vermont applied the same contribution limits to political parties that it applied to other contributors.

3.  Vermont treated expenses incurred by volunteers during campaign activities, such as travel expenses, against volunteers' contribution limits.

4.  The contribution limits did not adjust with inflation.

5.  The record contained no "special justification" warranting such a low limit.

*Id.* at 253–61.

Each of these factors weighed against the constitutionality of Vermont's contribution limits, and these factors—taken together—provided the basis for Justice Breyer's and Justice Roberts's votes to strike down the legislation. Although Justice Breyer referred to these five considerations as "factors," he did not create a traditional factor test. These factors, instead, read as a non-exhaustive list of reasons Vermont's contribution limits troubled the Court. Moreover, there is no indication courts are required to weigh each factor discussed in *Randall* in every case.

At the time, Justice Breyer's danger-signs test did not garner a majority. Instead, it left campaign finance experts and practitioners "with something that resembled a two-part test, endorsed by approximately two and a half Justices, with no well-defined parameters to which lower courts could adhere" until the Supreme Court adopted Justice Breyer's test in *Thompson v.*

*Hebdon*, 140 S. Ct. 348 (2019) (*per curiam*). John J. Martin, *Danger Signs in State and Local Campaign Finance*, 74 ALA. L. REV. 415, 432 (2022).

The Supreme Court granted certiorari in *Thompson* after the Ninth Circuit declined to apply the *Randall* danger-signs test because no opinion in *Randall* had commanded a majority. *Thompson* concerned whether Alaska's individual-to-candidate and individual-to-group contribution limits violated the First Amendment. *Id.* at 349. The district court upheld the contribution limits, and that ruling was affirmed by the Ninth Circuit. *Id.* The Supreme Court granted cert and announced the full Court's adoption of Justice Breyer's danger-signs test. *Thompson*, 140 S. Ct. at 350. Instead of describing the danger-signs test as Justice Breyer's, the Court glossed over the origins of this test: "In *Randall*, *we* identified several 'danger signs' . . . ." *Id.* at 350 (emphasis added). With this sleight of hand, the Supreme Court banished all doubt as to whether courts are bound to follow Justice Breyer's plurality opinion in *Randall*. *See also id.* at 350* ("Courts of Appeals from ten Circuits have . . . correctly looked to *Randall* in reviewing campaign finance restrictions.").

Having officially adopted the test, the Supreme Court proceeded to apply it to Alaska's contribution limits. Notably, the Supreme Court in *Thompson* identified not two but three danger signs, thereby changing the test. In addition to the two danger signs from *Randall*—(1) whether the contribution limits were substantially lower than the limits previously upheld by the Supreme Court, and (2) whether the contribution limits were substantially lower than comparable limits in other States—the Court named a third danger sign: Whether the contribution limits adjusted with inflation. *Id.* at 350–51.[6] *Thompson* also described the *Randall* danger-signs test as involving

---

[6] In *Randall*, Justice Breyer discussed Vermont's failure to index its contribution limits for inflation as a step-two consideration. 548 U.S. at 261. But in *Thompson*, the Court treated the failure to adjust for inflation as a step-one danger sign. 140 S. Ct. at 350–51.

"several" danger signs. 140 S. Ct. at 350. Thus, the Court's use of the word "several" expanded the universe of dangers signs from the two identified in *Randall* to at least three. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) ("Several" meaning "more than one or two but not a lot.").

The *Thompson* Court found danger signs, vacated the Ninth Circuit's judgment, and remanded for the Ninth Circuit to consider whether Alaska's contribution limits were "closely drawn." In other words, the Court conducted step one of the *Randall* test and remanded for the Ninth Circuit to consider step two. *Thompson* does not appear to have collapsed the first and second steps into a single analysis, but the Supreme Court's shift of the inflation factor from step two to step one does suggest the two-step test is flexible. *See* Martin, *supra* at 19 ("[*Thompson*] suggests that step one of the danger signs test might actually be fairly flexible, allowing courts to discuss danger signs not brought up in *Randall* and forego certain danger signs identified in *Randall*.").

To summarize, the Court views Plaintiffs' contribution-limit challenges as facial. To determine whether Plaintiffs' facial challenges succeed, the Court must apply the relevant constitutional test. The relevant constitutional test requires the Court to consider whether the State has shown the contribution limits are (1) justified by a sufficiently important interest and (2) closely drawn. The Court will analyze each contribution-limit challenge under this test.

## C.     Count I: $27,500 Limit on Contributions from Persons and Political Committees to State Political Parties

Plaintiffs first challenge the CRA's current $27,500 limit on contributions from persons and political committees to state political parties. NMSA 1978, §§ 1-19-34.7(A)(1), (C) (2019). The CRA defines "person" as "an individual or entity." NMSA 1978, § 1-19-26(P) (2019). The limit is per election, meaning the limit doubles for an election cycle with a primary and general election. § 1-19-34.7(A)(1). By statute, this limit automatically adjusts with inflation. § 1-19-

34.7(F). $27,500 is the current inflation-adjusted limit. https://www.sos.nm.gov/candidate-and-campaigns/how-to-become-a-candidate/campaign-contribution-limits/.

According to Plaintiffs, the limit on contributions to state political parties is unconstitutional because it "burdens and chills First Amendment speech and association rights without adequate justification and is not properly tailored." **Doc. 160 at 25**. Plaintiffs also challenge the limit amount on the basis that "it prevents candidates, especially challengers, from amassing the resources necessary to mount effective campaigns." *Id.* The Court disagrees. New Mexico shows both a sufficiently important interest in limiting contributions to political parties and that its limit is closely drawn. Count I is dismissed with prejudice for the reasons discussed.

**1.      New Mexico Has a Sufficiently Important Interest in Limiting Contributions to Political Parties to Prevent Circumvention and Actual or Apparent *Quid Pro Quo* Corruption.**

New Mexico bears the burden of showing a sufficiently important interest in limiting campaign contribution to political parties. *McCutcheon*, 572 U.S. at 210. To determine how heavy the State's burden is, the Court first analyzes whether the justifications given by the State are novel or implausible. If the State's reasons are neither novel nor implausible, the State's evidentiary burden is smaller. *Shrink*, 528 U.S. at 378. Once the Court determines the extent of the State's burden, the Court must review the evidence in the record to determine whether the State has adequately shown a serious threat of or need to address the problem identified by the State. *Cruz*, 142 S. Ct. at 1653; *Colorado II*, 533 U.S. at 445. Here, the State's justifications are neither novel nor implausible and sufficient evidence supports New Mexico's need to address circumvention as well as actual and apparent *quid pro quo* corruption.

###### a. *Prevention of circumvention and actual or apparent* quid pro quo *corruption is neither a novel nor implausible reason to limit contributions to state political parties.*

New Mexico defends its limit on contributions to political parties based on the threat of circumvention and the threat of actual and apparent *quid pro quo* corruption. **Doc. 282 at 30**. The Supreme Court has found these justifications to be neither novel nor implausible in the political-party context. *McConnell*, 540 U.S. at 144 ("The idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible."); *Colorado II*, 533 U.S. at 456 ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption."); *Shrink*, 528 U.S. at 391 (discussing corruption generally as neither novel nor implausible reason to limit contributions).

The Supreme Court's decision in *McConnell* demonstrates why New Mexico's interests here are not novel or implausible. In *McConnell*, the Supreme Court upheld the federal ban on "soft money" contributions to national political parties—i.e., contributions to national political parties "for activities intended to influence state or local elections." 540 U.S. at 123, 156. Before the ban, federal law had limited the amount of money individuals could donate to national political parties for federal elections ("hard money") but allowed unlimited donation of nonfederal money ("soft money") to national political parties for mixed-purpose activities, such as generic voter activities and certain advertising. *Id.* at 142. The law thus enabled parties "to use vast amounts of soft money in their efforts to elect federal candidates." *Id.* at 121–23. And through soft-money donations, political parties and candidates could circumvent the limits on federal-election "hard money" contributions. *Id.* at 126. The ban aimed "to put a stop to that practice" by prohibiting all soft-money contributions to national political parties. *Id.* at 142. The Supreme Court upheld

Congress's soft-money contribution ban based on an extensive evidentiary record of circumvention and *quid pro quo* corruption and its appearance. *Id.* at 145–54.[7]

The *McConnell* record contained ample evidence of circumvention. The Supreme Court highlighted evidence of candidates and donors exploiting "the soft-money loophole" with "national parties serving as willing intermediaries." *Id.* at 146. For example, declarations attested to the fact federal officeholders commonly asked for soft-money donations to national and state committees solely for the purpose of helping with federal campaigns. *Id.* The Supreme Court also discussed the practice of parties tallying the amount of soft money raised by each officeholder and the practice of parties contributing to an officeholder's campaign based on how much money that officeholder raised for the national party. *Id.* The record also contained evidence of donors asking for their soft-money contributions to be credited to a particular federal candidate and parties obliging. *Id.* The *McConnell* Court upheld the ban on soft-money contributions to political parties because of the risk of circumvention inherent to the close relationship between federal officeholders and national parties. *Id.* at 145, 155–56. According to the Supreme Court, the close relationship between national parties, federal candidates, and officeholders meant national parties were in a "unique position" to serve as "agents for spending on behalf of those who seek to produce

_____

[7] The Court also notes that the underlying federal limit on contributions to political parties for federal elections was not challenged in *McConnell*, and the Supreme Court did not signal any discomfort with this limit.  In fact, the Supreme Court emphasized the long-standing nature of the federal limit on contributions to national, state, and local parties for federal elections. *McConnell*, 540 U.S. at 144 ("For nearly 30 years, [the Federal Election Campaign Act] has placed strict dollar limits and source restrictions on contributions that individuals and other entities can give to national, state, and local party committees for the purpose of influencing a federal election. The premise behind these restrictions has been, and continues to be, that contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation."). This provides further support for the conclusion that limits on contributions to political parties are not novel.

obligated officeholders." *Id.* at 145 (citation omitted). The Supreme Court concluded the record suggested "large soft-money donations to national party committees are likely to buy donors preferential access to federal officeholders no matter the end to which their contributions [were] eventually put." *Id.* at 156.

The *McConnell* record also contained evidence of corruption or its appearance. The Supreme Court found particularly telling that from 1996 to 2000 more than half of the top soft-money donors gave substantial money to both major national parties, which signaled to the Supreme Court that these donors sought influence rather than to promote a particular ideology. *Id.* at 148. Not only did the Supreme Court identify instances of donors seeking influence—which the Supreme Court has made clear is no longer enough to justify contribution limits—but the Supreme Court identified instances of actual or apparent corruption. For instance, evidence connected soft-money donations to the manipulation of the legislative calendar, resulting in Congress's failure to enact generic drug legislation, tort reform, and tobacco legislation. *Id.* at 150.

Since *McConnell*, the Supreme Court has narrowed the type of corruption that can justify contribution limits to *quid pro quo* corruption or its appearance. *McCutcheon*, 572 U.S. at 192. This at first glance would seem to undermine some of the Supreme Court's reasoning in *McConnell*. But the Supreme Court has made clear that it has not overruled *McConnell*'s holding on soft-money contributions to political parties. *McCutcheon*, 572 U.S. at 209 n.6 ("Our holding . . . clearly does not overrule *McConnell*'s holding about 'soft money.'"). So, while the Court is mindful that only *quid pro quo* corruption or its appearance will do, the Court remains bound by *McConnell* and its discussion of the corruptive dangers of contributions to political parties.

New Mexico relies on *McConnell* to argue in favor of its own limits on contributions to political parties. After *McConnell*, the State's justifications are neither novel nor implausible.

Thus, the amount of evidence New Mexico must bring forward to justify its contribution limits is less, *Shrink*, 528 U.S. at 378, but still more than "mere conjecture," *McCutcheon*, 572 U.S. at 210.

> **b. New Mexico had a need to address circumvention and quid pro quo *corruption or its appearance through limits on contributions to state political parties*.**

The State must point to evidence of the need to address actual or apparent *quid pro quo* corruption or circumvention. The State has done so. The record contains evidence supporting a serious threat of circumvention and *quid pro quo* corruption in New Mexico if contributions to political party entities were unlimited. The Court begins by discussing Plaintiffs' attacks on the State's evidence and then proceeds to explain why the State has met its evidentiary burden.

Plaintiffs contend none of the State's evidence shows *quid pro quo* corruption involving contributions to a political party. **Doc. 281 at 13, 29**. The Court disagrees. The State need only show evidence of circumvention or *quid pro quo* corruption or its appearance "in [the] context" of the challenged limit. *Cruz*, 142 S. Ct. at 1653. The Court interprets the Supreme Court's requirement that the State present evidence of corruption or circumvention in the context of the challenged limit as not requiring examples precisely tailored to the limit. Thus, for Count I it is sufficient for the State to present examples of *quid pro quo* corruption or its appearance involving contributions to state political party entities—for example, the Democratic Leadership Fund and the Democratic Governors Association. To hold otherwise, would undermine the ability of the State legislature to "anticipate" *quid pro quo* corruption and circumvention. *McConnell*, 540 U.S. at 124. Plaintiffs argue the State has conceded its evidence does not relate to political parties based on statements made in 30(B)(6) Depositions of personnel from the Office of the New Mexico Secretary of State. **Doc. 281 at 16 n.20**; *see also* **Docs. 117-8, 117-9**. The Court is not persuaded. The State clearly does not concede this point. ***See* Doc. 282 at 31**. Additionally, the record contains

plenty of evidence of *quid pro quo* corruption or its appearance involving contributions to political party entities. Having resolved this issue, the Court now turns to the State's evidence.

First, the State presents evidence of the need to address *quid pro quo* corruption or its appearance through limits on contributions to political parties in New Mexico. The State points to two key examples of *quid pro quo* corruption or its appearance in New Mexico involving contributions to political party entities: (1) the convictions of Phillip Troutman and Kenneth Johnson in the 1980s and (2) the recent "pay-to-play" scandals of Governor Bill Richardson.

In the 1980s, New Mexico's State Investment Officer, Troutman, and Deputy State Treasurer, Johnson, were convicted in federal court of conspiracy to commit extortion. *United States v. Troutman*, 814 F.2d 1428, 1432 (10th Cir. 1987). Troutman and Johnson were convicted for soliciting $2,000 in contributions to the Democratic Leadership Fund from a bank being considered for a major state contract. *Id.* at 1434–35. The contributions took the form of four $500 tickets to a political fundraiser for the Democratic Leadership Fund. *Id.* at 1433. Johnson's foray into extortion began when he told the bank's agent that the prior state contract holder had lost its contract after failing to buy the requisite political fundraiser tickets. *Id.* Initially the bank signaled that it would purchase the fundraising tickets, but then the bank changed course and refused to buy the tickets. *Id.* at 1434. Johnson became "extremely upset by [the bank's] decision not to contribute." *Id.* First Johnson and Troutman urged the Board of Finance to delay its approval of the bank's state contract. *Id.* Then Johnson attempted to get the bank to contribute the $2,000 through two other means. *Id.* at 1434–36. The bank refused both options. *Id.* at 1434–35. Finally at a dinner with the bank's agents, Troutman made clear that the bank would only receive the state contract if it contributed the $2,000. *Id.* Johnson said, "You have to pay to play"; "This is how business is done." *Id.* Troutman and Johnson's story provides a quintessential example of "a direct

exchange of an official act for money" and "dollars for political favors." *McCutcheon*, 572 U.S. at 192. In fact, the Tenth Circuit in Troutman's case upheld the district court's determination "that the solicitation was made on a '*quid pro quo*' basis." *Troutman*, 814 F.2d at 1455–56. Troutman and Johnson demonstrate the risk of *quid pro quo* corruption involving contributions to political parties and political party committees.

The State next points to the more recent example of *quid pro quo* allegations against New Mexico Governor Bill Richardson. In 2008, Governor Richardson came under federal investigation for "pay-to-play" schemes, including allegations that he awarded $38 million in state contracts to a private prison corporation that contributed over $66,500 to Richardson's campaigns and $30,000 to the Democratic Governors Association while Richardson was chair. **Doc. 122-8** (S. Terrell, *Richardson Foundation Donors Remain Undisclosed*, SANTA FE NEW MEXICAN, Jan. 20, 2009). Governor Richardson was also accused of awarding approximately $1.4 million in state contracts to a California company that contributed $100,000 to two PACs controlled by Richardson and $10,000 to his re-election campaign. **Doc. 122-6** (S. Stolberg, "Richardson Won't Pursue Cabinet Post," N.Y. TIMES, Jan. 5, 2009); **Doc. 122-7** (Frosch & McKinley, Jr., "Political Donor's Contracts Under Scrutiny in New Mexico," N.Y. TIMES, Dec. 18, 2008). As Plaintiff Harvey Yates Jr. stated, "New Mexico's long waltz with corruption perhaps reached its fastest modern tempo during the Richardson administration." **Doc. 122-9** (Harvey Yates, Jr., "Create a Legislative Panel to Help Root out N.M. Corruption," ALBUQUERQUE J., Aug. 2, 2013). The allegations against Governor Richardson demonstrate the State's need to address the appearance of *quid pro quo* corruption in the context of contributions to political party entities. The State also presented evidence of considerable public awareness of past political corruption scandals,

including Governor Richardson's, when the CRA was being debated. **Doc. 242-1** (Bluestone Dep. at 51:12–52:1–9).

Plaintiffs contend that "pay-to-play" corruption does not qualify as the appearance of *quid pro quo* corruption and thus cannot justify the State's interest in contribution limits. The Court disagrees. According to Plaintiffs, pay-to-play corruption is not *quid pro quo* corruption, so the appearance of pay-to-play corruption is not the appearance of *quid pro quo* corruption. **Doc. 281 at 7 n.5.** To justify its position, Plaintiffs cite to the 2006 Ethics Task Force Subcommittee Report on Campaign Finance where *Pay to Play* was defined as contributions given in exchange for "an assurance" that the contributor will be "kept in mind" "without a promise of a favor." **Doc. 261-11 at 4.** The Task Force's understanding of pay-to-play corruption does not bind either the State or the Court in this litigation. The Court finds the federal investigation into Governor Richardson's alleged pay-to-play schemes qualifies as the appearance of *quid pro quo* corruption because the State has demonstrated public awareness of the serious risk that Governor Richardson was awarding state contracts—the *quid*—in exchange for campaign contributions—the *quo*. And to the extent Plaintiffs contend there is no evidence these acts were seen by the public and impacted the public's faith in democracy, ***see* Doc. 281 at 17**, the Court disagrees based on the mountain of newspaper articles the State cites discussing the Richardson investigation and public corruption in New Mexico generally. There is no question that the public was aware of the pay-to-play allegations against Governor Richardson; in fact, the public was so aware that Richardson pulled out from consideration as President Obama's Commerce Secretary. **Doc. 122-6** (Stolberg, *supra* at 3); **Doc. 122-7** (Frosch & McKinley, *supra* at 3).[8]

---

[8] The Court references newspaper articles because the issue at hand requires consideration of legislative facts. *See United States v. Hunt*, 63 F.4th 1229, 1250 (10th Cir. 2023) ("When the resolution of a dispute turns on legislative facts, courts regularly relax the restrictions on judicial

To show the need to address *quid pro quo* corruption and its appearance, the State also points to evidence suggesting donors often contribute to candidates from both state political parties. In *McConnell* the Supreme Court found that evidence of donors giving substantial amounts of money to *both* major national parties left room for "no other conclusion but that these donors were seeking influence, or avoiding retaliation, rather than promoting any particular ideology." 540 U.S. at 148. Similarly, data from the New Mexico Secretary of State's campaign finance database reflects this trend. *See, e.g.*, Democrat Lujan Grisham's Third General Report (reporting $5,000 contribution from Pueblo of Santa Ana on November 1, 2022); Republican Ronchetti's Second General Report (reporting $10,400 contribution from Pueblo of Santa Ana on October 3, 2022); Democrat Lujan Grisham's First General Report (reporting $10,000 contribution by BW Gas Convenience, LLC d/b/a Allsup's on August 22, 2022); Republican Ronchetti's First General Report (reporting $9,000 contribution by Allsup's on August 23, 2022) *all available at* N.M. Sec'y of State, Campaign Finance System, https://login.cfis.sos.state.nm.us/#/index. This evidence lends support for the need articulated by the State to address *quid pro quo* corruption and its appearance by limiting contributions that can be made to state political parties.

Finally, the State relies on evidence of corruption involving contributions to political parties from national litigation challenging the constitutionality of other campaign contribution limits.[9] Plaintiffs contend this evidence lacks relevance to New Mexico because the State "hasn't

---

inquiry."). The Court notes, however, that the newspaper articles only support the appearance of *quid pro quo* corruption—they do not show <u>actual</u> *quid pro quo* corruption.

[9] *See, e.g.*, Joint Appendix, *McConnell v. FEC*, 2003 WL 22070885 (U.S. Aug. 15, 2003) (record in constitutional challenge to BCRA's limits on soft money contributions to parties) (*e.g.*, Decl. of Sen. John McCain, ¶¶ 4-11 (J.A. 390-94) (describing examples of, at a minimum, the appearance of quid-pro-quo corruption involving contributions to political parties); Decl. of Sen. Warren Rudman, ¶¶ 7-12 (J.A. 742-44) (describing actual and apparent exchange of contributions–

proffered argument, evidence, or even allegations that New Mexico has corruption issues surrounding political parties." **Doc. 281 at 16**. The record shows otherwise. Evidence of political party corruption and circumvention from other jurisdictions is relevant and proper for this Court to consider when assessing whether the State has shown a need to prevent *quid pro quo* corruption and its appearance by imposing limits on contributions to political parties. *See Homans*, 366 F.3d at 909; *see also Cruz*, 142 S. Ct. at 1653.

The State also relies on evidence of the serious risk of circumvention if no limits were imposed on contributions to state political parties. Plaintiffs fault the State for not presenting *actual* evidence of circumvention like the Supreme Court considered in *Colorado II*, **doc. 281 at 19**, but that is not required. As Plaintiffs themselves acknowledge, the test is whether the State's evidence "confirms a serious threat of" circumvention. *McCutcheon*, 572 U.S. at 219. Thus, the State "need not show any completed quid pro quo transactions to satisfy its burden." *Lair*, 873 F.3d at 1180; *see also Citizens United*, 558 U.S. at 357. The State has met its evidentiary burden.

Tracking the Supreme Court's analysis in *McConnell*, the State argues a serious threat of circumvention exists because of the close relationship between state political parties and their

---

including through political parties–for actions by members of Congress); Decl. of Sen. Alan Simpson, ¶¶ 10-14 (J.A. 811-12) (describing apparent and actual quid-pro-corruption involving contributions to political parties)); Joint Appendix, *FEC v. Colo. Republican Fed. Campaign Cmtee.*, 2000 WL 33981443 (U.S. Dec. 1, 2000) (record in constitutional challenge to FECA's coordinated expenditure limits) (*e.g.*, Decl. of Robert Hickmott (J.A. 243a-261a) (describing facilitation of contributions between donors and candidates by Democratic Party, including "tally system" by which party credited contributions to candidates; Decl. of Robert Rozen (J.A. 262a-266a) (same); Decl. of Sen. Paul Simon, ¶¶ 6–7 (J.A. 268a–269a) (same); Decl. of Sen. Timothy E. Wirth (J.A. 272a-278a) (same)); Amicus Br. of Beck et al., *FEC v. Colo. Republican Fed. Campaign Cmtee.*, 2000 WL 1792974 (U.S. Dec. 1, 2000) (brief by political scientists describing how parties can facilitate interactions between candidates and donors and how parties do not break chain of corruption).

candidates. This argument is well taken. *See McCutcheon*, 572 U.S. at 145; *see also King*, 741 F.3d at 1100 ("[P]olitical parties have a close enough relationship with candidates such that Congress can justifiably restrict contributions to parties—in ways that go beyond merely preventing the circumvention of contribution limits to candidates."). The State put on evidence that the Republican Party of New Mexico ("NMGOP") works closely with its Republican candidates. **Doc. 122-18** (30(b)(6) Dep. of Ryan Cangiolosi ("Cangiolosi Dep.") at 20:8–21:13); **Doc. 242-3** (30(b)(6) Dep. of Anissa Tinnin ("Tinnin Dep.") at 20:7–21:9, 21:20–25). Additionally, the record shows NMGOP provides its candidates with campaign assistance, strategic advice, messaging, trainings, and workshops. **Doc. 122-18** (Cangiolosi Dep. at 20:8–21:13, 64:21–65:5, 66:8–67:16, 82:1–17); **Doc. 242-3** (Tinnin Dep. at 20:7–21:9, 21:20–25). The party often coordinates joint rallies, fundraising events, mailers, and get-out-the-vote activities with candidates. **Doc. 122-18** (Cangiolosi Dep. at 49:7–50:9, 51:6–23, 66:8–67:16). Former Plaintiff Mark Veteto testified to the importance of these types of fundraisers as ways for donors to meet candidates. **Doc. 122-12** (Dep. of Mark Veteto ("Veteto Dep.") at 27:3–24). Mr. Veteto testified his presence at fundraisers and the like allowed him access to former Governor Susana Martinez, including the ability to email, text, and call her. *Id.*

The record also suggests NMGOP maintains a donor list and at times provides candidates with donor information, including the names of individual donors. **Doc. 122-18** (Cangiolosi Dep. at 64:9–20, 66:10–12). In the past, NMGOP has discussed with donors how their contribution to the party would be used, including discussions of specific political campaigns and individual candidates. *Id.* (*id.* at 89:9–24). For example, Plaintiff Harvey Yates testified that while he was chair of NMGOP "[i]f the individual was interested, for instance, primarily in electing a senate

31

candidate or changing congress, then the money would be put on the federal side to the extent it was permitted." **Doc. 122-11** (Dep. of Harvey E. Yates, Jr. ("Yates Dep.") at 18:15–18).

The Court acknowledges that New Mexico's evidence of circumvention is not as strong as the voluminous record in *McConnell*, but the evidence still supports—by a preponderance of the evidence—a serious risk that state political parties could serve as "agents for spending on behalf of those who seek to produce obligated officeholders" in the absence of contribution limits. *McConnell*, 540 U.S. at 145. Although NMGOP does not appear to engage in the blatant practice of tallying the amount of money raised for each candidate, Mr. Yates's and Mr. Cangiolosi's testimony suggests NMGOP discusses with donors how their contributions to the party will be used and that the party—to the extent permitted—considers how donors would like their contribution to be used. NMGOP also shares donor information with candidates, including the individual names of donors. The Supreme Court in *McConnell* found these types of practices to be suspect and specifically mentioned the fact that national political parties "distribute lists of potential or actual donors" as evidence of circumvention. *Id.* at 147. The *McConnell* Court also mentioned joint fundraising as a means by which candidates "take advantage of the party's higher contribution limits while still allowing donors to give to their preferred candidate." *Id.* at 146. The record here contains similar evidence of NMGOP coordinating joint fundraising events and dinners with its candidates. Such evidence suggests a real risk of donors circumventing the individual-candidate limits by donating to political parties if there was no limit on contributions to parties. The State has shown the risk of circumvention justifies the limit on contributions to political parties.

In sum, the State has offered more than "mere conjecture," *Shrink*, 528 U.S. at 379, and established two independent bases—circumvention and actual or apparent *quid pro quo* corruption—on which the Court can rely to find a sufficiently important interest.

**2.      The Limits on Contributions to Parties Are Closely Drawn to the State's Interest in Preventing Circumvention and Actual or Apparent *Quid Pro Quo* Corruption.**

To carry its burden, the State must show not only a sufficiently important interest in limiting campaign contributions but also that the contribution limit is "closely drawn to avoid the unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 191. The Court extends "a measure of deference to the judgment of the legislative body that enacted the law" when faced with a constitutional challenge, and in the absence of any danger signs, the Court will uphold the contribution limit selected by the state legislature. *Davis*, 554 U.S. at 737. When assessing whether a limit is closely drawn, the Supreme Court has instructed lower courts to first look out for three danger signs:

> **(1)** the contribution limits are "substantially lower" than limits previously upheld by the Supreme Court;
>
> **(2)** the contribution limits are "substantially lower" than comparable limits in other states;
>
> **(3)** the contribution limits are not adjusted for inflation.

*Thompson*, 140 S. Ct. at 350–51. If and only if the Court finds danger signs will the Court then proceed to "examine the record independently and carefully to determine whether [the] contribution limits are 'closely drawn' to match the State's interest." *Randall*, 548 U.S. at 249.

The CRA currently limits contributions to state political parties by individuals and other entities to $27,500 per election cycle. Plaintiffs contend this limit is not closely draw because the limit is arbitrary—in amount and in application. **Doc. 281 at 20–22.** Whether a limit is arbitrary is not a first-step danger sign the Supreme Court has identified. Rather, whether a limit is arbitrary

is something the Court could consider at the second step, along with the other potential five considerations laid out by Justice Breyer in *Randall*. Thus, the Court looks first to whether CRA's limit on contributions to political parties presents danger signs. Finding none, the Court affords the legislature due deference and upholds the $27,500 political-party limit as closely drawn.

### a. *The CRA's limit on contributions to state political parties is not substantially lower than limits previously upheld by the Supreme Court.*

The first danger sign identified by the Supreme Court requires the Court to determine whether the $27,500 limit on contributions to political parties is lower than limits previously upheld by the Supreme Court. The Supreme Court upheld a complete ban on soft-money contributions to national political parties in *McConnell*. 540 U.S. at 156. The CRA's $27,500 limit far exceeds a complete ban thus raising no red flags or danger signs.

### b. *The CRA's limit on contributions to state political parties is not substantially lower than comparable limits in other states.*

The second danger sign requires the Court to compare New Mexico's contribution limit with comparable limits in other states. New Mexico limits contributions individuals and entities can make to political parties at $27,500 per election cycle—for a total of $55,000 if there is a primary and general election. The other 49 states place the following limits on contributions to political parties:

|  | Limits on Contributions to State Political Party |
| --- | --- |
| **Alabama**[1] | Unlimited. |
| **Alaska**[2] | $5,000/year. |
| **Arizona**[3] | Unlimited. |
| **Arkansas**[4] | Unlimited. |
| **California**[5] | $45,500 to political party account for state candidates. |
| **Colorado**[6] | $4,675/year. |

| | |
|---|---|
| **Connecticut**[7] | $10,000/election cycle. |
| **Delaware**[8] | $20,000/election period. |
| **Florida**[9] | Unlimited. |
| **Georgia**[10] | Unlimited. |
| **Hawaii**[11] | $25,000/two-year election period. |
| **Idaho**[12] | Unlimited. |
| **Illinois**[13] | $13,700/election cycle. |
| **Indiana**[14] | Unlimited. |
| **Iowa**[15] | Unlimited. |
| **Kansas**[16] | $15,000/year. |
| **Kentucky**[17] | $5,000/year to state executive committee of a political party. $5,000/year to subdivision of a state political party. $5,000/year to a caucus campaign committee. |
| **Louisiana**[18] | $100,000/four-year period. |
| **Maine**[19] | Unlimited. |
| **Maryland**[20] | $6,000/4-year election cycle. |
| **Massachusetts**[21] | $5,000/year. |
| **Michigan**[22] | $48,875/year house or senate political party caucus committee. |
| **Minnesota**[23] | Unlimited. |
| **Mississippi**[24] | Unlimited. |
| **Missouri**[25] | $25,000/election at the state, county, municipal, district, ward, and township level combined. |
| **Montana**[26] | Unlimited. |
| **Nebraska**[27] | Unlimited. |
| **Nevada**[28] | Unlimited. |
| **New Hampshire**[29] | $10,000/election cycle, including exploratory phase. |
| **New Jersey**[30] | $75,000/year. |
| **New York**[31] | $138,600/year. |
| **North Carolina**[32] | Unlimited. |
| **North Dakota**[33] | Unlimited. |

| | |
|---|---|
| **Ohio**[34] | $46,499.08/year. |
| **Oklahoma**[35] | $10,000/year. |
| **Oregon**[36] | Unlimited. |
| **Pennsylvania**[37] | Unlimited. |
| **Rhode Island**[38] | $10,000/year. |
| **South Carolina**[39] | Unlimited. |
| **South Dakota**[40] | $10,000/year. |
| **Tennessee**[41] | Unlimited. |
| **Texas**[42] | Unlimited. |
| **Utah**[43] | Unlimited. |
| **Vermont**[44] | $11,180/single source/election cycle. |
| **Virginia**[45] | Unlimited. |
| **Washington**[46] | Unlimited. |
| **West Virginia**[47] | $10,000/year. |
| **Wisconsin**[48] | Unlimited. |
| **Wyoming**[49] | Unlimited. |

New Mexico's limit on contributions to state political parties is higher—and often substantially higher—than the comparable limit imposed in 20 states. Admittedly New Mexico's limit is lower than the 26 states that allow unlimited political-party contribution. Still the Court does not find New Mexico's limit—when compared to states that do limit this type of contribution—to be "sufficiently low as to generate suspicion that [it is] not closely drawn." *Randall*, 548 U.S at 249. The Court does not find a danger sign here.

### c. *The CRA's limit adjusts with inflation.*

Finally, when assessing whether danger signs exist, the Court looks at whether the contribution limits adjust with inflation. The CRA's contribution limits do. § 1-19-34.7(F). Thus, the Court finds no danger signs here either.

The State has carried its burden and shown (1) a sufficiently important interest in limiting contributions to political parties, and (2) that the specific limit imposed is closely drawn. The Court defers to the New Mexico legislature's judgment and upholds the CRA's limit on contributions to state political parties. Therefore, the Court **DISMISSES with prejudice** Count I.

**D.      Count II: $27,500 Limit on Contributions from National to State Political Parties.**

Plaintiffs next challenge the constitutionality of CRA's $27,500 limit on contributions from one political party to another, §§ 1-19-34.7(A)(1), (C), (E), as applied to federal-election contributions from a national to state political party. **Doc. 160 at 25**. Plaintiffs claim this limit is preempted by the Federal Election Campaign Act ("FECA"), which allows transfers of federal election funds between national, state, district, or local committees of the same political party. 52 U.S.C. § 30116(a)(4); *see also* 52 U.S.C. § 30143(a) (FECA "supersede[s] and preempt any provision of State law with respect to election to Federal office.").

The State does not dispute that the CRA does not apply to funds for federal campaigns that are subject to FECA. **Doc. 282 at 32**. And this Court previously held as much when it issued the preliminary injunction. *King*, 850 F. Supp. 2d at 1215 ("[T]he Act does not impose limits on contributions of money directed to candidates for federal elective offices, and that if it did it would be preempted by FECA."). Moreover, the 2019 amendments to the CRA made it even clearer that the CRA does not limit contributions for federal elections. *See* § 1-19-26(H)(1) (defining "contribution" as various types of donations "made or received for a political purpose"); § 1-19-

37

26(S) (defining "political purpose" as "for the purpose of supporting or opposing a ballot question or . . . candidate"); § 1-19-26(G) (defining "candidate" as "an individual who seeks or considers an office in an election covered by the [CRA]"); § 1-19-26(K) (excluding federal elections from elections covered by CRA); *see also* N.M. State Ethics Comm'n, Advisory Op. 2021-05, at 3–4 (Feb. 5, 2021), https://www.sec.state.nm.us/wp-content/uploads/2021/02/Advisory-Op.-2021-05-Signed.pdf (interpreting CRA as not applying to candidate for federal office). The Court agrees that the CRA does not apply to contributions from national political parties to state political parties for federal election campaigns; accordingly, Plaintiffs' claim fails. This conclusion is further supported by the Court's duty to interpret the CRA to not conflict with federal law. *See United States v. Brune*, 767 F.3d 1009, 1023 (10th Cir. 2014) ("[A]s between multiple reasonable interpretations of a statute, we will always prefer one that sustains constitutionality.").[10]

The Court **DISMISSES** Count II **with prejudice**.

**E.    Count III: $5,500 Limit on Contributions from State to County Political Parties.**

Plaintiffs also contend CRA's $5,500 limit on contributions from state to county political parties is unconstitutional. As previously discussed, it is the State's burden to show a sufficiently important interest in limiting campaign contributions from a state political party to a county political party. To determine the extent of this burden, the Court must assess whether the

---

[10] It is unclear whether Plaintiffs intended to also challenge the limit the CRA places on contributions by national to state political parties for state and local elections. During discovery, Plaintiffs informed the State that they were not alleging the national Republican Party would have contributed state election funds to state Republican Party entities but for the challenged contribution limits. **Doc. 122-21** (Email from State counsel to Plaintiffs' counsel memorializing parties' discovery meet-and-confer). Plaintiffs' allegations and briefing on this issue are undeveloped. Based on Plaintiffs' operative complaint, the parties briefing, and statements made by Plaintiffs' counsel during discovery, the Court does not understand Plaintiffs to be challenging the CRA's limit on contributions from national political parties to state political parties for state and local elections.

justifications given by the State are novel or implausible. *Shrink*, 528 U.S. at 378. Once the quantum of evidence the State must bring forward is determined, the Court will review the record to determine whether the State has shown a serious risk of or need to address the problem identified. *Cruz*, 142 S. Ct. at 1653; *Colorado II*, 533 U.S. at 445. Here, the State seeks to impose limits in a novel context—the state-to-county-party context—thus, the State's burden is heightened. Faced with this heightened burden, the State fails to set forth sufficient evidence of the need to address circumvention by limiting contributions by state to county parties.

1.    **The State seeks to prevent circumvention through a novel limit—i.e., a limit on contributions from state to county parties.**

The Supreme Court has never addressed whether the government's interest in preventing circumvention can justify limiting contributions from state to county political parties. Thus, the State's justification is novel, and the State must present more record evidence to support the risk of corruption or circumvention in this new context. *See Shrink*, 528 U.S. at 378.

2.    **The State Fails to Provide Sufficient Evidence that No Limits on State-to-County-Party Contributions Would Create a Serious Threat of Circumvention.**

The State appears to defend this limit primarily on circumvention grounds. According to the State, "The New Mexico legislature reasonably targeted corruption by applying limits to contributions from one party entity to another, as part of its framework for preventing donors from funneling unlimited money through parties to candidates." **Doc. 282 at 33**. However, the Court is unclear how exactly this limit prevents circumvention, and the State's pleadings and submissions do not provide the clarity the Court needs to uphold this limitation.

To defend this limit, the State relies heavily on the close relationship between state and county parties. **Doc. 282 at 34**. For example, the State points to evidence that the chair of the

Republican Party of Bernalillo County[11] has weekly conversation with the chair of NMGOP. *Id.* As to Count I, the Court was persuaded that evidence of NMGOP's close connection to candidates and donors presented enough of a risk of circumvention to uphold CRA's limit on contributions to political parties. But the close relationship between local and state parties does not hold the same risk. As the Supreme Court has explained, "there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 572 U.S. at 210. Thus, it follows that the more attenuated the donor is from the candidate the less risk of *quid pro quo* corruption. Here, evidence of a close relationship between the state and county chair of the Republican party—absent any other evidence—is not enough to justify a contribution limit between the two parties. Further, the State has not put forth evidence that there is a serious risk of donors circumventing valid contribution limits by donating money to a state party with the intention that the money be donated to a county party so that the money can ultimately be donated to a candidate in exchange for a *quid pro quo* arrangement or the appearance of one.

The State also points to two newspaper articles from Wisconsin that suggest individuals and PACs may have contributed to county parties to evade the limits Wisconsin places on contributions individuals and PACs can make to candidates. **Doc. 261-14 at 3** (Adam Rogan, "Wisconsin GOP Said to Be Investigating Alleged Illegal Donations Involving Trump's PAC," *The Journal Times*, Nov. 7, 2022) (discussing leaked phone calls mentioning "playing musical money" and "washing" contributions to candidates by routing money through county parties); **Doc. 261-15 at 5** (Jim Piwowarczyk, "GOP County Chair Told Adam Steen He Wanted to 'Wash'

---

[11] Bernalillo County is the most populous county in New Mexico and encompasses the city of Albuquerque, the State's largest city.
https://www.census.gov/quickfacts/fact/table/bernalillocountynewmexico/PST045222.

Money for Trump's Save America PAC," *Wisconsinrightnow.com*, Nov. 6, 2022) (reporting that candidate suggested funneling donations through county parties to get around individual contribution limits). These articles do not deal with contribution transfers from a state party to a county party. On the contrary, both articles suggest there was no coordination between the Republican Party of Wisconsin and the county Republican Party allegedly involved in the circumvention scheme. Rather than demonstrating the risk that unlimited contributions between state and county parties pose, the articles show the risk created by unlimited contributions from county parties to candidates. In 2022, Wisconsin allowed unlimited contributions from county parties to candidates. This situation is not present in New Mexico because the CRA limits this type of contribution. §§ 1-19-34.7(A)(1), (B). Plaintiffs have not challenged the limit to contributions county parties can make to candidates, and the Court has no reason to question this limit's legitimacy—especially given the Wisconsin newspaper articles.

Finally, while the Court upheld the CRA's limit on contributions to state political parties, the limit on state to county intra-party contributions appears even further removed from the root problem, i.e., individual big money donors finding ways to evade based limits by funneling money through a political party to engage in *quid pro quo* corruption. This limit, like the aggregate contribution limit in *McCutcheon* and the limit on post-election contribution repayment in *Cruz*, strikes the Court as a "prophylaxis-upon-prophylaxis" approach by which the State seeks to prevent the circumvention of valid base limits on individual donors by layering on two additional limits, each one more removed than the next. *Cruz*, 142 S. Ct. at 1652. As the Supreme Court has emphasized, "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements." *McCutcheon*, 572 U.S. at 221 (citation omitted). Here, the Court faces three layers of prophylaxis, which the Court interprets as "a

significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 142 S. Ct. at 1653. Thus, the Court concludes the limit on contributions from state to county parties is too attenuated from the root concern of *quid pro quo* corruption between individuals and candidates.

The State has not presented sufficient evidence of the serious risk of circumvention to justify limiting contributions from state to county parties. Because the State has not shown a sufficiently important interest, the Court need not address whether the specific limit is closely drawn. Plaintiffs' Count III challenge to the limit in Sections 1-19-34.7(A)(1) and (E) on contributions from state to county political parties prevails. The Court **DECLARES** these provisions of CRA unconstitutional and **ENJOINS** the State from enforcing them.

**F.      Counts IV, V: $5,500 limit on contributions from state parties to nongubernatorial candidates; $11,000 limit on contributions from state parties to gubernatorial candidates.**

Next, Plaintiffs contend New Mexico's limits on contributions from state political parties to candidates are unconstitutional. Currently, the CRA limits state parties from contributing more than $5,500 to a nongubernatorial candidate or candidate committee and from contributing more than $11,000 to a gubernatorial candidate or candidate committee. §§ 1-19-34.7(A)(1), (B). These limits—like the CRA's other contribution limits—adjust with inflation and are per election cycle. §§ 1-19-34.7(A)(1), (F). The CRA places the same contribution limits on "political committee[s]" that it places on "person[s]." §§ 1-19-34.7(A)(1), (B). Under the CRA "political committee[s]"

include "political part[ies]," among other associations. NMSA 1978, §§ 1-19-26(P), (Q) (2019).[12]

Here, Plaintiffs only challenge the CRA's limit on contributions by political parties to candidates.[13]

Plaintiffs argue the limits placed on contributions from state parties to candidates for state and local offices are unconstitutional because they are neither justified by a sufficiently important interest nor closely drawn to avoid unnecessary abridgement of Plaintiffs' First Amendment freedoms. For each of Plaintiffs' contribution challenges, the Court first assesses whether the State's justification for the contribution limit at issue is novel or implausible to determine the quantum of evidence the State must present at the first step. Once the State's evidentiary burden is established, the Court then considers the record to determine if the State has met its burden and shown a sufficiently important interest in this contribution limit. If the State has done so, the Court will then consider whether the actual limit imposed is closely drawn.

The Court concludes the State's interest in preventing circumvention is neither novel nor implausible in this context; and the State has shown a sufficiently important interest in limiting contributions from state parties to candidates; however, the Court ultimately holds the specific limits are not closely drawn and, therefore, they are unconstitutional.

---

[12] A "political party" is defined by the CRA as "an association that qualifies as a political party pursuant to the provisions of Section 1-7-2 NMSA 1978." § 1-19-26(R).

[13] In Counts IV and V, Plaintiffs frame their challenges as "as applied to Contributions Made by NMGOP to Its Candidates and Candidate Committees" and "as applied to Contributions Made by NMGOP to Its Governor Candidates." **Doc. 160 at 28-29**. The Tenth Circuit has explained, "the labels the parties attach to claims are not determinative." *Supreme Ct. of New Mexico*, 839 F.3d at 914. Instead, "the court must focus on whether the claim and the relief therein extend beyond the plaintiffs' particular circumstances." *Id.* Here, Plaintiffs anticipate State enforcement actions, but the State has not actually brought any such actions against NMGOP. Thus, the Court interprets Plaintiffs' claims as facial challenges to the CRA's limits on contributions from state parties to state and local candidates and candidate committees, not as an as-applied challenge particular to NMGOP and its candidates.

**1.     Preventing circumvention is not a novel or implausible reason to limit party-to-candidate contributions.**

New Mexico defends the limit on party-to-candidate contributions based on the serious risk that without these contribution limits, donors would circumvent valid limits on individual-to-candidate contributions by donating to political parties. *See* **Doc. 282 at 35–39**. The Court agrees with the State that the Supreme Court's *Colorado II* decision controls and makes clear that circumvention is a plausible—and not novel—justification for imposing limits on the contributions political parties can make to candidates. *Colorado II*, 533 U.S. at 456 ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption.") (addressing circumvention in the context of party-to-candidate contributions).

In *Colorado II*, the Supreme Court faced the question of whether political party election expenditures coordinated with a candidate should be "treated functionally as contributions" to that candidate. 533 U.S. at 444. The Supreme Court held that they should and that coordinated expenditures by political parties could "be restricted to minimize circumvention of [other] contribution limits." *Id.* at 465. Simply stated, the Supreme Court held that contributions from parties to candidates could be limited based on circumvention. The Supreme Court's reasons for upholding the federal limits on coordinated expenditures—i.e., contributions—by political parties controls Plaintiffs' instant challenge.

The *Colorado II* Court first found that "substantial evidence demonstrate[d] how candidates, donors, and parties test the limits of the current law, and it show[ed] beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced by declaring parties' coordinated spending wide open." *Id.* Among the evidence highlighted by the Supreme Court was evidence that donors give to parties "with the tacit understanding that the favored candidate will benefit." *Id.* at 458. And evidence that the National Democratic Party had

frequently engaged in "tallying" contributions to help "connect donors to candidates through the accommodation of a party." *Id.* at 459. According to one witness's testimony, "Donors would be told the money they contributed could be credited to any Senate candidate." *Id.* Additionally, the *Colorado II* record showed that "substantial donations turn the parties into matchmakers whose special meetings and receptions give the donors the chance to get their points across to the candidates." *Id.* at 461. "[I]f contributions to a party were not used as a funnel from donors to candidates," the Supreme Court reasoned, "there would be no reason for using the tallying system the way the witnesses have described it." *Id.* The Court thus concluded that if parties were permitted to make unlimited contributions to candidates, "the inducement to circumvent would almost certainly intensify." *Id.* at 460.

The Supreme Court expressed particular concern that no limits on party contributions would lead to the circumvention of valid limits on individual and PAC contributions. In 2001, when *Colorado II* was decided, individual contributions to a candidate were limited to $2,000 per election cycle, and individual contributions to a national political party committee were limited to $20,000 per year. *Id.* at 458. The disparity between these two numbers was critical to the Supreme Court's decision in *Colorado II* because "[i]f a candidate could arrange for a party committee to foot his bills, to be paid with $20,000 contributions to the party by his supporters, the number of donors necessary to raise $1,000,000 could be reduced from 500 (at $2,000 per cycle) to 46 (at $2,000 to the candidate and $20,000 to the party, without regard to donations outside the election year)." *Id.* at 460. In other words, a candidate could direct donors to contribute to his party to "reduc[e] the number of donors requiring time-consuming cultivation." *Id.* Because the numbers provide a strong incentive for candidates to direct donors to parties and because the Supreme Court found substantial evidence of parties acting as matchmakers between party donors and individual

candidates, the Court upheld the federal limit on coordinated-expenditure contributions by national parties to candidates.

*Colorado II* governs the Court's analysis of whether New Mexico has a sufficiently important interest in limiting contributions from state parties to candidates. Thus, the Court directly references the types of evidence and logic the Supreme Court found dispositive in *Colorado II*.

**2.     New Mexico Has a Sufficiently Important Interest in Limiting Contributions from State Parties to Candidates to Prevent Circumvention.**

To carry its burden, the State must point to evidence of the serious risk of circumvention. The State has carried this burden: The record suggests unlimited campaign contributions from political parties to candidates would create a serious risk of circumvention in New Mexico. The State relies heavily on the close relationship between state political parties and their candidates to show the risk of circumvention. ***See* Doc. 282 at 36–37.** As the Court detailed in its analysis of Count I, the record contains evidence that NMGOP works closely with its Republican candidates, including evidence that NMGOP provides its candidates with campaign assistance and strategic advice and often coordinates joint rallies and fundraising events with its candidates. **Doc. 122-18** (Cangiolosi Dep. at 20:8–21:13, 49:7–50:9, 51:6–23, 64:21–65:5, 66:8–67:16, 82:1–17); **Doc. 242-3** (Tinnin Dep. at 20:7–21:9, 21:20–25). The record also contains testimony about the importance of these types of fundraisers as ways for donors to meet candidates. **Doc. 122-12** (Veteto Dep. at 27:3–24). Specifically, former plaintiff Mark Veteto testified that his presence at State Republican fundraisers and the like allowed him access to former Governor Susana Martinez, including the ability to email, text, and call her. ***Id.*** The record also suggests NMGOP maintains party donor lists and has in the past provided candidates with donor information, including the names of individual donors. **Doc. 122-18** (Cangiolosi Dep. at 64:9–20, 66:10–12). Further, the record contains testimony that NMGOP has talked with donors about how their contribution would

be used, including to which candidate the funds would go. *Id.* (*Id.* at 89:9–24); **Doc. 122-11** (Yates Dep. at 18:15–18).[14]

This evidence is the same kind of evidence the Supreme Court considered in *Colorado II*. And like the Supreme Court found in *Colorado II*, the Court finds donors in New Mexico may give to NMGOP "with the tacit understanding that the favored candidate will benefit." 533 U.S. at 458. While there is no specific evidence of NMGOP "tallying" party contributions to route them to a particular candidate, the State's evidence suggests NMGOP discussed how contributions to the party would be used with donors and took into consideration whether the donor was interested in electing a particular candidate. NMGOP's discussions with donors coupled with evidence that NMGOP shared donor lists and information with candidates and hosted joint fundraising events for candidates suggests there is a risk of circumvention because contributions to NMGOP could turn the party "into matchmakers whose special meetings and receptions give the donors the chance to get their points across to the candidates." *Id.* at 461. Recall that in *Colorado II* the Supreme Court discussed political parties "matchmaking" candidates and donors at fundraising events as evidence of circumvention. *Id.* There is also testimony that a match was in fact made between Mr. Veteto and Governor Martinez at just such a fundraising event, which resulted in Mr. Veteto's ability to email, text, and call the Governor. Applying the Supreme Court's reasoning from *Colorado II*, the match between Mr. Veteto and Governor Martinez suggests a risk of circumvention.

---

[14] The Court discusses NMGOP's close relationship with its candidates because that is the evidence New Mexico relies on to meet its burden. Nothing in the record suggests the Democratic Party of New Mexico does not engage in similar practices. But because neither party points to evidence about the Democratic Party of New Mexico, the Court does not discuss it here.

Not only does the close party-candidate relationship suggest a risk of circumvention, but the disparity between the CRA's individual-to-candidate limits and the CRA's individual-to-party limits suggests a risk, like that identified in *Colorado II*, of candidates funneling contributions through political parties to avoid lower individual-to-candidate limits. Under the CRA, individuals cannot contribute more than $5,500 to a nongubernatorial candidate and more than $11,000 to a gubernatorial candidate; however, the limit on contributions to a state political party is set much higher at $27,500. Applying the Supreme Court's logic to this case, if "a candidate could arrange for a party committee to foot his bills, to be paid with [$27,500] contributions to the party by his supporters, the number of donors necessary to raise $100,000 could be reduced from approximately [18] (at [$5,500] per cycle) to approximately [3] (at [$5,500] to the candidate and [$27,500] to the party, without regard to donations outside the election year)." *Id.* at 460. Although the magnitude of benefit to a candidate who routed contributions through a party was greater in *Colorado II*, it is still significant that a candidate could collect six times the contributions if they were passed through a party that could make unlimited contributions to the candidate. Thus, the Court concludes—like the Supreme Court did in *Colorado II*—that if state parties were permitted to make unlimited contributions to candidates, "the inducement to circumvent would almost certainly intensify." *Id.*

The State has carried its burden at the first prong. New Mexico has shown—by a preponderance of the evidence—a sufficiently important interest in limiting contributions from state political parties to state and local candidates. However, the State having carried its burden on this first prong alone is not enough for the Court to uphold the CRA's limits. The State must also show that the limits chosen by the New Mexico Legislature are "closely drawn to avoid the unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 191.

3.     **The Limits on Contributions from State Political Parties to Nongubernatorial and Gubernatorial Candidates Are Not Closely Drawn.**

The State must show the contribution limits at issue are "closely drawn." "[I]n determining whether a particular contribution limit was 'closely drawn,' the amount, or level, of that limit could make a difference." *Randall*, 548 U.S. at 247. The Court "must assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199. The fit need not be "perfect," the "least restrictive," or "the single best disposition," but it must be "reasonable." *Id.*

The Supreme Court has endorsed a two-part test to determine if contribution limits are "closely drawn." *Id.* at 248-63; *Thompson*, 140 S. Ct. at 350. First, the Court must assess whether "danger signs" exist. If the Court identifies any danger signs, the Court must "examine the record independently and carefully to determine whether [the] contribution limits are 'closely drawn' to match the State's interest." *Randall*, 548 U.S. at 249. In the absence of any "danger signs," the Court should defer to the legislature's judgment and uphold the contribution limit. *Id.* at 248.

The Supreme Court has identified three danger signs:

  **(1)** the contribution limits are "substantially lower" than limits previously upheld by the Supreme Court;

  **(2)** the contribution limits are "substantially lower" than comparable limits in other states;

  **(3)** the contribution limits are not adjusted for inflation.

*Thompson*, 140 S. Ct. at 350–51. If the Court finds any of these danger signs, the Court will proceed to independently review the record.

The CRA currently limits contributions by state parties to state and local candidates at $5,500 to a nongubernatorial candidate and $11,000 to a gubernatorial candidate. Plaintiffs contend that neither limit is closely drawn. The Court first looks at whether danger signs exist.

a. *New Mexico's limits on contributions by state political parties to candidates are substantially lower than limits previously upheld by the Supreme Court.*

In *Colorado II*, the Supreme Court upheld the federal limits on the coordinated-expenditure contributions political parties could make to federal candidates. At the time—in 2000—the federal limits ranged from $67,560 to $1,636,438 for Senate candidates and $33,780 for House candidates in most states and $67,560 for House candidates in states with only one representative. 533 U.S. at 439 n.3. These limits have since been adjusted for inflation in 2023 to range from $118,700 to $3,623,400 for Senate candidates; $118,700 for House candidates in states with only one representative; and $59,400 for House candidates in all other states. https://www.fec.gov/help-candidates-and-committees/making-disbursements-political-party/coordinated-party-expenditures/coordinated-party-expenditure-limits/.

The CRA limits at issue are currently $5,500 for nongubernatorial candidates and $11,000 for gubernatorial candidates per election cycle. Thus, when there is a primary and general election, a state party could contribute up to $11,000 to a nongubernatorial candidate and $22,000 to a gubernatorial candidate. These rates are far lower than those upheld in *Colorado II*. Admittedly federal elections can differ drastically from state and local campaigns in terms of the campaign resources required. The Supreme Court has not, however, treated state and federal limits as apples and oranges. Rather, in *Randall* the Supreme Court assessed danger signs by comparing Vermont's limits to the federal limits previously upheld by the Supreme Court. *See Randall*, 548 U.S. at 250 ("These limits are well below the limits this Court upheld in *Buckley*."). The Court finds a danger sign because New Mexico's limits on contributions by state parties to candidates are substantially lower than limits previously upheld by the Supreme Court in *Colorado II.*

***b. New Mexico's limits on contributions from state political parties to candidates are substantially lower than comparable limits in other States.***

When looking for danger signs, the Court also must compare New Mexico's contribution limits to those in other states to determine whether the limits at issue are "substantially lower" than comparable limits in other States. *Randall*, 548 U.S. at 253. Here, New Mexico's limits are substantially lower than those in most other States.

New Mexico currently limits contributions state parties can make to gubernatorial candidates at $11,000 per election cycle—$22,000 in total, for a primary and general election. § 1-19-34.7(B). This limit is substantially lower than comparable limits in 36 other States: **Alabama** (unlimited)[50]; **Alaska** ($100,000/year)[51]; **Arizona** ($80,400/election cycle)[52]; **California** (unlimited)[53]; **Colorado** ($789,025/election cycle)[54]; **Connecticut** ($50,000/election cycle)[55]; **Delaware** ($75,000/election period)[56]; **Florida** ($250,000/candidate)[57]; **Illinois** (unlimited for general election; $274,200 for primary)[58]; **Indiana** (unlimited)[59]; **Iowa** (unlimited)[60]; **Kansas** (unlimited for general; $2,000 for contested primary)[61]; **Kentucky** (unlimited)[62]; **Louisiana** (unlimited)[63]; **Michigan** ($750,000 with public funding, $166,500 without public funding)[64]; **Minnesota** ($20,000/two-year period)[65]; **Mississippi** (unlimited)[66]; **Montana** ($100,000/governor and lieutenant governor filing jointly)[67]; **Nebraska** (unlimited)[68]; **New Jersey** (unlimited)[69]; **New York** (unlimited)[70]; **North Carolina** (unlimited)[71]; **North Dakota** (unlimited)[72]; **Ohio** ($874,182.62/candidate)[73]; **Oregon** (unlimited)[74]; **Pennsylvania** (unlimited)[75]; **South Carolina** ($50,000/election cycle)[76]; **South Dakota** (unlimited)[77]; **Tennessee** ($477,300/election)[78]; **Texas** (unlimited)[79]; **Utah** (unlimited)[80]; **Vermont** (unlimited)[81]; **Virginia** (unlimited)[82]; **Washington** ($5,765,902.80/candidate)[83]; **Wisconsin** (unlimited)[84]; and **Wyoming** (unlimited).[85] And New Mexico's limit is lower, but only slightly lower, than the limits in **Oklahoma** ($25,000/candidate)[86] and **Rhode Island** ($25,000/year).[87]

51

There are 11 states with limits lower than New Mexico: **Arkansas** ($2,900/election cycle)[88]; **Georgia** ($8,400/election cycle)[89]; **Hawaii** ($6,000/election period)[90]; **Idaho** ($10,000/election cycle)[91]; **Maine** ($1,950/election cycle)[92]; **Maryland** ($6,000/4-year election cycle)[93]; **Massachusetts** ($3,000/year)[94]; **Missouri** ($2,825/candidate)[95]; **Nevada** ($5,000/election cycle)[96]; **New Hampshire** ($10,000/election cycle, including exploratory phase)[97]; and **West Virginia** ($2,800/election cycle).[98] Nevertheless, the Court concludes that because New Mexico's limit on party-to-gubernatorial-candidate contributions is substantially lower than comparable limits imposed in the vast majority of other States, a danger sign exists.

For all other state and local candidates, New Mexico currently limits contributions state parties can make at $5,500 per election cycle—$11,000 total, for a primary and general election. § 1-19-34.7(A)(1). New Mexico's limits are certainly substantially lower than the 20 states that place no limit on the amount political parties can contribute to candidates. But the question of whether New Mexico's limit is substantially lower than comparable limits enacted in other states is complicated by the fact that 22 states have enacted different limits depending on the specific office a candidate seeks.

New Mexico has enacted only two limits: one for gubernatorial candidates and one for all other candidates. Because New Mexico limits contributions to nongubernatorial statewide candidates at the same limit as local candidates New Mexico's limit—at least for statewide candidates—is substantially lower than the limit enacted in 40 other states. Moreover, New Mexico's limit for senate candidates is substantially lower than the limit set in 33 other states. To understand how New Mexico's limits compare, it is helpful to look at the limits in place in the other 49 states:

| State | State Party to Candidate Contribution Limits |
| --- | --- |
| **Alabama**[99] | Unlimited. |

| | |
|---|---|
| **Alaska**[100] | $100,000/Lieutenant governor.<br>$15,000/Senate.<br>$10,000/House.<br>$5,000/Municipal; delegate to a constitutional convention; or judge seeking retention.<br>***Per Year*** |
| **Arizona**[101] | $80,400/Statewide candidate.<br>$10,400/City, town, county, district office candidate.<br>$8,400/Legislative candidate.<br>***Per Election Cycle*** |
| **Arkansas**[102] | $2,900/Candidate.<br>***Per Election Cycle*** |
| **California**[103] | $5,500/City and county candidate.<br>Unlimited for all other candidates. |
| **Colorado**[104] | $789,025/Governor & lieutenant governor.<br>$157,750/Secretary of State, State Treasurer, or Attorney General candidate.<br>$28,375/State senate candidate.<br>$25,475/County candidate.<br>$20,475/State house, State Board of Education, University of Colorado Regent, or DA.<br>$2,500/School district director candidate.<br>***Per Election Cycle*** |
| **Connecticut**[105] | $35,000/Lieutenant Governor, Secretary of State, Treasurer, Comptroller or AG.<br>$10,000/State senate candidate, probate judge, or CEO of town, city, or borough candidate.<br>$5,000/State house candidate.<br>$5,000/Other municipal office.<br>***Per Election Cycle*** |
| **Delaware**[106] | $25,000/Statewide candidates except Governor.<br>$25,000/N.C.C. Executives.<br>$15,000/N.C.C. President.<br>$5,000/State senate candidate and all other county offices.<br>$3,000/State house candidate, all other offices.<br>***Per Election Period*** |
| **Florida**[107] | $250,000/Statewide candidate.<br>$50,000/All other candidates.<br>***Aggregate Total*** |
| **Georgia**[108] | $8,400/Statewide office candidate<br>$3,300/Other candidates<br>***Per Election Cycle*** |
| **Hawaii**[109] | $6,000/Statewide candidate.<br>$4,000/Non-statewide 4-year office candidate.<br>$2,000/Non-statewide 2-year office candidate.<br>***Per Election Period*** |
| **Idaho**[110] | $10,000/Statewide candidate.<br>$2,000/State legislature candidate.<br>***Per Election Cycle*** |
| **Illinois**[111] | <u>Unlimited in general elections.</u><br><u>Limited for primary elections:</u><br>$274,200/Statewide candidate.<br>$171,500/Senate, Supreme or Appellate Court in Cook County, or countywide office in Cook County candidate.<br>$102,900/House, Supreme or Appellate Court outside Cook County, or countywide office outside Cook County.<br>$68,500/All other candidates. |
| **Indiana**[112] | Unlimited. |
| **Iowa**[113] | Unlimited. |

| | |
|---|---|
| **Kansas**[114] | Unlimited for general election. |
| | Limits for contested primaries: |
| | $2,000/Statewide candidate. |
| | $1,000/State senate or state board of education candidate. |
| | $500/House, district judge, district magistrate judge, district attorney, or a local office candidate. |
| **Kentucky**[115] | Unlimited. |
| **Louisiana**[116] | Unlimited. |
| **Maine**[117] | $975/County candidate. |
| | $575/Municipal candidate. |
| | $475/Legislative candidate. |
| | ***Per election Cycle*** |
| **Maryland**[118] | $6,000/Candidate. |
| | ***Per 4-year Election Cycle*** |
| **Massachusetts**[119] | $3,000/Candidate. |
| | ***Per Year*** |
| **Michigan**[120] | $24,500/Senate candidate. |
| | $12,250/House candidate. |
| | $83,250–$12,250/Lower court judicial office and local level office depending on population. |
| | ***Per Election Cycle*** |
| **Minnesota**[121] | $25,000/Judicial Office candidate. |
| | $20,000/Lieutenant Governor candidate. |
| | $15,000/Attorney General candidate. |
| | $10,000/Secretary of State, State auditor, legislative candidate. |
| | $10,000/Legislative candidate. |
| | ***Per Two-Year Period*** |
| **Mississippi**[122] | Unlimited. |
| **Missouri**[123] | $2,825/Statewide candidate. |
| | $2,400/Senate candidate. |
| | $2,000/House candidate. |
| | ***Per Election Cycle*** |
| **Montana**[124] | $100,000/Governor and lieutenant governor candidates filing jointly. |
| | $75,000/Statewide candidate except Governor. |
| | $15,000/Public service commission candidate. |
| | $3,000/Senate candidate. |
| | $2,000/All other candidates. |
| | ***Per Election*** |
| **Nebraska**[125] | Unlimited. |
| **Nevada**[126] | $5,000/Candidate. |
| | ***Per Election Cycle*** |
| **New Hampshire**[127] | $10,000/Candidate. |
| | ***Per Election Cycle, Including Exploratory Phase*** |
| **New Jersey**[128] | Unlimited. |
| **New York**[129] | Unlimited |
| **North Carolina**[130] | Unlimited. |
| **North Dakota**[131] | Unlimited. |
| **Ohio**[132] | $874,182.62/Statewide candidate. |
| | $174,371.53/Senate candidate. |
| | $86,798.27/House candidate |
| | ***Per Election Cycle*** |
| **Oklahoma**[133] | $25,000/Statewide candidate. |
| | $10,000/All other state candidates. |
| | ***Per Candidate*** |
| **Oregon**[134] | Unlimited. |

| Pennsylvania[135] | Unlimited. |
|---|---|
| Rhode Island[136] | $25,000/Candidate.<br>**Per Year** |
| South Carolina[137] | $50,000/Statewide candidate.<br>$5,000/All other candidates.<br>**Per Election Cycle** |
| South Dakota[138] | Unlimited. |
| Tennessee[139] | $477,300/Statewide candidate.<br>$76,300/Senate candidate.<br>$38,300/All other state and local candidates.<br>**Per Election** |
| Texas[140] | Unlimited. |
| Utah[141] | Unlimited. |
| Vermont[142] | Unlimited. |
| Virginia[143] | Unlimited. |
| Washington[144] | $5,765,902.80/Statewide candidate.<br><br>The amount a state or local party can contribute to a candidate depends on the number of registered voters at $1.20 per registered voter. As low as $2,022.00/County candidate for certain small counties. |
| West Virginia[145] | $2,800/Candidate.<br>**Per Election Cycle** |
| Wisconsin[146] | Unlimited. |
| Wyoming[147] | Unlimited. |

New Mexico's limits on party contributions to both to gubernatorial and nongubernatorial candidates are not the lowest in the Nation, but that is not what the danger-signs test requires. Rather, the Court must assess whether in comparison to limits adopted by other states, New Mexico's limits are "sufficiently low as to generate suspicion that they are not closely drawn." *Randall*, 548 U.S at 249. Compared to other states, New Mexico limits party contributions to gubernatorial candidates and nongubernatorial statewide candidates at substantially lower rates. This presents the Court with a second danger sign.

The Court finds danger signs exist because New Mexico's limits on contributions by state parties to candidates are substantially lower than limits previously upheld by the Supreme Court and are substantially lower than comparable limits enacted in other states. Having found two danger signs, the Court must independently review the record to determine whether New Mexico's

55

limits are "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25.[15]

There is no set analysis the Court must conduct when independently reviewing the record. But Justice Breyer's plurality opinion in *Randall* provides guidance on what lower courts should consider when determining whether a contribution limit is closely drawn. In *Randall*, Justice Breyer found Vermont's contribution limits not closely drawn based on five considerations:

1. The record suggested contribution limits would "significantly restrict the amount of funding available for challengers to run competitive campaigns."

2. Vermont applied the same contribution limits to political parties that it applied to other contributors.

3. Vermont treated expenses incurred by volunteers during campaign activities, such as travel expenses, against volunteers' contribution limits.

4. The contribution limits did not adjust with inflation.

5. The record contained no "special justification" warranting such a low limit.

548 U.S at 253–61. These considerations were specific to the Vermont contribution limit at issue; thus, the Court need not weigh each *Randall* factor in every case. Here, the Court finds Justice Breyer's first, second, and fifth consideration applicable. Based on these three considerations, the Court concludes New Mexico's limits on contributions parties can make to gubernatorial and nongubernatorial candidates are not closely drawn.

---

[15] The CRA limits adjust for inflation, which does not raise the third danger sign. Nevertheless, the presence of two danger signs was enough to warrant a closer review of the record in *Randall*; therefore, two danger signs should trigger a closer review here as well.

> **i.      The record does not show New Mexico tailored its limits to how much it costs to run competitive statewide and local campaigns.**

First, Plaintiffs challenge whether New Mexico's limits are closely drawn on the grounds that "New Mexico hasn't proven that it gave *any* genuine consideration to the cost to run a competitive campaign, much less to do so as a challenger." **Doc. 281 at 27**. The Court agrees.

As a threshold matter, the parties appear to disagree about who has the burden at this step. Plaintiffs argue the State has now shown that the legislature considered the cost to run a competitive campaign, and the State argues Plaintiffs failed to present any evidence that the contribution limits prevent candidates from mounting effective campaigns. The Supreme Court has made clear that it is the State's burden to establish the constitutionality of a statute challenged on First-Amendment grounds. *McCutcheon*, 572 U.S. at 210. On the other hand, the evidence the Supreme Court relied on in *Randall* to strike down Vermont's contribution limits was put forth by the petitioners. 548 U.S. at 253; *see also Lair*, 873 F.3d at 1185 (suggesting *plaintiffs* needed to show that challengers could not amass sufficient resources to run competitive races in Montana). Since the Supreme Court has not explained its test as a burden-shifting one, the Court holds that the State has the burden of establishing that the limits are closely drawn by a preponderance of the evidence. Regardless of who failed to develop the record, the record remains devoid of any actual evidence of how much it would cost to mount an effective challenger campaign at any level of New Mexico politics.

That said, the Supreme Court did not set forth an exhaustive list of considerations or types of evidence lower courts must consider when assessing whether a contribution limit is closely drawn. Thus, the Court need not rely on the same type of evidence presented in *Randall* to come to the same conclusion. Plaintiffs focus their arguments on the arbitrary nature of New Mexico's limits. The Court agrees that the limits appear untethered to any data on how much it would cost

to mount a competitive campaign for a particular New Mexico office. This is one factor, among several, that leads the Court to conclude New Mexico's limit on how much a political party can contribute to candidates is not closely drawn.

As initially enacted, the CRA limited contributions to non-statewide candidates to $2,300/election cycle for individual donors and $5,000/election cycle for party donors, and the CRA limited contributions to statewide candidates to $5,000/election cycle for individual donors and $5,000/election cycle for party donors. NMSA 1978, § 1-19-34.7(A) (2009). In 2019 the New Mexico Legislature changed the structure of the contribution limits and raised the limits. Instead of setting limits based on whether a candidate ran for a statewide office, New Mexico now sets limits based on whether the candidate runs for Governor. Currently parties and individuals can contribute no more than $11,000/election cycle to a gubernatorial candidate and no more than $5,500/election cycle to a candidate for any other office. Plaintiffs contend the 2019 limits were arbitrarily increased and that an "upward change to the limits alone is not a demonstration of narrow tailoring." **Doc. 281 at 21.** The Court agrees that simply raising limits does not in and of itself make the limits closely drawn.

According to the State, New Mexico's "decision to make limits less restrictive to accommodate other interests, even if it makes a law marginally less effective at preventing corruption, does not make either the former or current limits invalid." **Doc. 282 at 22.** And the State justifies the higher gubernatorial limit based on "the additional funding it may take to mount a state-wide campaign for the State's highest office, as compared to more local or regional elections." **Doc. 282 at 39**. This reasoning is sound, but it fails to account or provide any justification for limiting other statewide offices, such as Attorney General or Secretary of State, at the same lower level as local or regional candidates.

The only evidence that the legislature may have considered how much money it takes to run for a particular office comes from the 2006 Governor's Ethics and Campaign Finance Reform Task Force Subcommittee Report on Campaign Finance, where the subcommittee reasoned New Mexico's low limit for Public Regulation Commission candidates suggested that other candidates could likewise run successful campaigns constrained by relatively low contribution limits:

> New Mexico law already imposes a limit of $500 on campaign contributions to candidates for the Public Regulation Commission (as well as a ban on contributions from entities regulated by that agency). Notably, candidates for the Public Regulation Commission run for office within districts much larger than Senate or House districts – for purposes of Public Regulation Commission elections, the state is divided into five large districts and each candidate runs for election in one of the districts. This experience demonstrates that contribution limits are not impractical and that candidates can successfully run for office within the constraints of relatively low contribution limits.

**Doc. 261-11 at 6**. Although this suggests some thought was given to the amount of money required to run a campaign, it is not enough to demonstrate that the low limit for all statewide candidates, except gubernatorial candidates, is closely drawn. There is no evidence New Mexico considered how much it would cost to run a campaign other than a PRC campaign.

Additionally, there is no evidence that New Mexico considered the cost for a challenger to run an effective statewide campaign against an incumbent. The Supreme Court has cautioned against limits that prevent "challengers from mounting effective campaigns against incumbent officeholders" and that "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Randall*, 548 U.S. at 248–49. Moreover, the Supreme Court has recognized that generally "competitive races are likely to be far more expensive than the average race." *Id.* at 255 (citing N. Ornstein, T. Mann, & M. Malbin, Vital Statistics on Congress 2001–2002, at 89–98 (2002) for federal "data showing that spending in competitive elections, *i.e.*,

where incumbent wins with less than 60% of vote or where incumbent loses, is far greater than in most elections, where incumbent wins with more than 60% of the vote.").

The "fit between the stated governmental objective and the means selected to achieve that objective" need not be "perfect," but it must be "reasonable." *McCutcheon*, 572 U.S. at 191. Here, it is not reasonable to assume all statewide candidates, except gubernatorial candidates, should be limited at the same low level as local and district candidates to prevent circumvention or *quid pro quo* corruption. Given the Supreme Court's concern with the ability of challengers to mount effective campaigns, the Court finds New Mexico's failure to put forth any evidence as to how much it costs to run a campaign in New Mexico suggests the limits are not closely drawn.

### ii.    New Mexico applies the same contribution limits to state party contributors that it applies to individual contributors.

Plaintiffs also contend the CRA limits are not closely drawn because New Mexico imposes the same contribution limits on state political parties that it imposes on individuals. In *Randall*, Justice Breyer concluded Vermont's contribution limits were not closely drawn in part because Vermont placed the same limits on political party contributions that it placed on individual contributions. 548 U.S. at 256. Justice Breyer reasoned that Vermont's "insistence that political parties abide by *exactly* the same low contribution limits that apply to other contributors threaten[ed] harm to a particularly important political right, the right to associate in a political party." *Id.* The same logic leads the Court to similarly conclude that New Mexico's limit on state party contributions to candidates is not closely drawn.

Relevant here, New Mexico imposes the same contribution limits on individuals as it does on state political parties. To illustrate why this might matter let us imagine, much like Justice Breyer imagined in *Randall*, that 6,000 New Mexicans would like to give $100 to NMGOP "because, though unfamiliar with the details of the individual race, they would like to make a small

financial contribution to the goal of electing a [Republican] state legislature." *Id.* at 258. Now the party would have $600,000. Further imagine that NMGOP "believes control of the legislature will depend on the outcome of three (and only three) House races." *Id.* The CRA would prohibit NMGOP from contributing more than $11,000 to each legislative candidate in these pivotal races, "thereby thwarting the aims of the 6,000 donors from making a meaningful contribution to state politics by giving a small amount of money to the party they support." *Id.* In other words, NMGOP would be able to meaningfully use only $33,000 of the $600,000 it received from small donations. Thus, in keeping with the Supreme Court's reasoning in *Randall*, the Court concludes that New Mexico's current limits on contributions parties can make to candidates "would severely inhibit collective political activity by preventing a political party from using contributions by small donors to provide meaningful assistance to any individual candidate." *Id.*

The State responds by pointing to this Court's 2012 preliminary injunction order. In the order, the Court rejected Plaintiffs' early argument that New Mexico's imposition of the same contribution limits on political parties and individuals was a standalone reason to grant the requested preliminary injunction. *See Republican Party of New Mexico v. King*, 850 F. Supp. 2d 1206 (D.N.M. 2012), *aff'd*, 741 F.3d 1089 (10th Cir. 2013). The Court explained that under *Randall* the identical treatment of political parties and individuals was not a constitutional violation in and of itself but "a further factor weighing against the constitutional validity of the contribution limits." *Id.* at 1213 (quoting *Randall*, 548 U.S. at 259). The Court stands by its position that this consideration alone is not enough to invalidate contribution limits, but developments in the law since the Court's 2012 order suggest more weight should be given to this factor. At the time of this Court's order in 2012, *Randall* was still a plurality opinion signed by only two justices. Since then, the full Court has adopted Justice Breyer's opinion. *See Thompson v. Hebdon*, 140 S. Ct. 348

(2019). In *Thompson,* Justice Ginsburg noted that "Alaska's law [did] not exhibit certain features found troublesome in Vermont's law. For example, unlike in Vermont, political parties in Alaska are subject to much more lenient contribution limits than individual donors." *Id.* at 351. This statement, although pure dicta, underscores the importance the Supreme Court still places on more lenient contribution limits for political parties. The Court concludes that New Mexico's imposition of the same limits on individuals and political parties demonstrates the limits are not closely drawn.

### iii.    The record contains no "special justification" warranting such a low limit for nongubernatorial statewide candidates.

Finally, Plaintiffs contend New Mexico has not put forth any "special justification" for its limits. The Court agrees. Although the State is correct that New Mexico's limits are higher than the limits the Supreme Court struck down in *Randall*, that does not mean the State need not show special justifications for, in particular, limiting contributions to statewide nongubernatorial candidates at the same level as other local or district candidates.

Because the current limits on contributions to candidates from state parties are not closely drawn, the Court **DECLARES** the statutory provisions challenged in Counts IV and V unconstitutional and **ENJOINS** Defendants from enforcing the relevant provisions.

### G.    Count IX: Independent-Election-Activities Challenge

Plaintiffs' challenge in Count IX is difficult to discern. That said, the Court understands Plaintiffs' challenge as two-fold: (1) Plaintiffs appear to argue the CRA's definitions of independent expenditure are too narrow and therefore do not exempt other independent election activities from being subject to contribution limits; and (2) Plaintiffs seem concerned that political committees with dual purposes—hybrid PACs—will be unable to pay for operating expenses from

the independent-expenditure funds they are permitted to collect in a segregated bank account. The Court is not convinced by either of these two asserted challenges.

First, Plaintiffs contend that the "State has no constitutional cognizable interest in limiting contributions to political committees when those contributions are earmarked for independent election activities." **Doc. 160 at 41**. To make this argument, Plaintiffs have advanced a term— *independent election activities*—that does not appear in the CRA. As the State correctly points out Plaintiffs are far from clear about what activities they claim fall under the umbrella of "independent election activities." Based on Plaintiffs' briefing, the Court understands independent election activities to include get-out-the-vote and voter-registration activities as well as overhead and administrative expenses for these activities plus activities that fall under the CRA's definitions of independent expenditures. To the extent Plaintiffs intended other activities to qualify as independent election activities, Plaintiffs failed to make that clear.

Independent expenditures under the CRA are defined as follows:

"independent expenditure" means an expenditure that is:
> (1) made by a person other than a candidate or campaign committee;
> (2) not a coordinated expenditure as defined in the [CRA]; and
> (3) made to pay for an advertisement that:
>> (a) expressly advocates the election or defeat of a clearly identified candidate or the passage or defeat of a clearly identified ballot question;
>> (b) is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question; or
>> (c) refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot;

NMSA 1978, § 1-19-26(N) (2019). Plaintiffs seem to argue that this definition is too narrow because it does not include other "independent election activities" that Plaintiffs would like to collect money for without being subjected to contribution limits. Because these alleged independent election activities are not explicitly covered by the CRA's definition of independent expenditures, Plaintiffs assert that contributions to PACs for these purposes would be unlawfully subject to contribution limits. The Court does not agree with Plaintiffs' position.

As the State points out, contributions for operating expenses and get-out-the-vote or voter-registration activities are not subject to the CRA's limits because contributions for these types of expenses do not fall under the CRA's definition of "contribution." **Doc. 282 at 12**. A "contribution" must be "made or received for a political purpose," § 1-19-26(H), which is defined as "for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate," § 1-19-26(S). The Court agrees with the State that contributions for operating expenses and get-out-the-vote and voter-registration activities are not subject to the CRA's limits because neither activity is for the purpose of supporting or opposing a particular ballot question or candidate. Thus, Plaintiffs' claims fail because the CRA does not regulate the activities Plaintiffs claims it does.

To the extent Plaintiffs contend that the CRA unconstitutionally limits hybrid PACs from paying for independent-expenditure administrative expenses, Plaintiffs are wrong. The State responds, "Administrative expenses that are part of an independent expenditure are *already* exempt from the CRA's contribution limits." **Doc. 282 at 12** (citing § 1-19-34.7(I)). The Court agrees. That said, the Court notes that to the extent Plaintiffs are trying to engineer a loophole whereby hybrid PACs can pay *all* overhead and administrative costs from independent-expenditure accounts, such a course is not allowed. The Tenth Circuit has already expressed approval of the

use of segregated bank accounts as a valid means to separate funds subject to contribution limits from funds exempt from those limits. *King*, 741 F.3d at 1097 ("Because NMTA maintains such a segregated account, it does not run afoul of candidate contribution restrictions."). The Court **DISMISSES** Count IX **with prejudice**.

## II.       Counts VI, VII, VIII: Overbreadth and Vagueness Challenges to CRA Definitions

Plaintiffs' second set of challenges target the CRA's definitions of "independent expenditure" and the accompanying regulatory definition of "expressly advocate" as unconstitutionally overbroad and vague. Qualifying under the CRA's "independent expenditure" definition triggers registration and expenditure disclosure requirements, and a person or entity's knowing and willful noncompliance with these requirements could result in up to a $1,000 fine and/or no more than one year in prison. NMSA 1978, § 1-19-36(A) (2021). Plaintiffs' fear of triggering these provisions, the theory goes, prevents them from circulating certain ads and chills them from engaging in materially similar future activity. But the Court remains mindful that the question before the Court is "not whether Plaintiff[s] can make expenditures for the speech [they] propose[] or raise money without limitation, but simply whether [they] must provide disclosure of [or register based on their] electoral advocacy." *Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 792 (10th Cir. 2013). !

Plaintiffs challenge three definitions that each define expenditures that must be disclosed. First Plaintiffs take issue with two of the CRA's definitions of independent expenditure. An independent expenditure is defined as an expenditure made to pay for an advertisement that either (1) "expressly advocates the election or defeat of a clearly identified candidate or the passage or defeat of a clearly identified ballot question;" (2) "is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot

question;" or (3) "refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot." § 1-19-26(N)(3)(a) – (c).

Plaintiffs challenge the latter two definitions and refer to these challenges as their "appeal to vote" and "electioneering communication" challenges, respectively. Plaintiffs' final challenge is to the regulatory definition of "expressly advocate." NMAC 1.10.13.7(I). According to Plaintiffs, each definition is unconstitutionally overbroad and vague. The Court is not persuaded and dismisses Counts VI, VII, VIII with prejudice.

## A.   Plaintiffs' Overbreadth and Vagueness Challenges Are Facial, Not As-Applied.

As a threshold matter, Plaintiffs' vagueness and overbreadth challenges to the definitions are facial challenges. In their briefing, Plaintiffs present these challenges, in the alternative, as as-applied challenges. But Plaintiffs fail to allege as-applied challenges in their complaint. Instead, Counts VI, VII, and VIII present facial challenges with requests that the Court declare the definitions unconstitutionally vague and overbroad in their entirety. ***See*** **Doc. 160, ¶¶ 168–170**. Thus, the Court will treat Plaintiffs' challenges as facial because Plaintiffs seek declarations that the statutes and regulations are unconstitutional and seek to enjoin their enforcement generally, not only as applied to a party. For "a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982).

**B.      Law Regarding Overbreadth and Vagueness Challenges**

Plaintiffs have the burden of establishing that the challenged regulations are unconstitutionally overbroad or vague. *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1151, 1153 (10th Cir. 2020). For a statute or regulation to be considered facially overbroad, the law must "prohibit[] a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The overbreadth doctrine "seeks to strike a balance between competing social costs." *Id.* "On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* "On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." *Id.* To strike this balance, the Supreme Court "vigorously enforce[s] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* The overbreadth doctrine is not to be "casually employed" because overbreadth is "strong medicine." *Id.* at 293.

As to vagueness challenges, a statute or regulation can be unconstitutionally vague for either of two reasons: (1) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). However, the Supreme Court has emphasized that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted).

**C.      Law Regarding Disclosure and Registration Requirements**

"Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." *Citizens*

*United v. FEC*, 558 U.S. at 366 (internal citations and quotation marks omitted). "Accordingly, the Supreme Court has subjected those requirements to 'exacting scrutiny'. . . ." *Free Speech v. FEC*, 720 F.3d 788, 792–93 (10th Cir. 2013). Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* "Disclosure requirements are not inherently content-based nor do they inherently discriminate among speakers. In most circumstances they will be a less burdensome alternative to more restrictive speech regulations. For this reason, they are not only reviewed using a lower degree of scrutiny, they are routinely upheld." *Citizens United v. Schneiderman*, 882 F.3d 374, 382 (2d Cir. 2018) (citing *Citizens United*, 558 U.S. at 366–67). As the Supreme Court has explained, "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Citizens United*, 588 U.S. at 368.

In *Buckley v. Valeo*, the Supreme Court held that expenditure reporting and disclosure requirements could survive so long as they reached only speech that was "unambiguously campaign related." 424 U.S. at 70–81. Speech qualifies as unambiguously campaign related if it "expressly advocates or is the functional equivalent of express advocacy." *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 676 (10th Cir. 2010) (citation omitted). The Supreme Court has defined "the functional equivalent of express advocacy" as speech that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469–70 (2007) ("*WRTL-II*").

Here, Plaintiffs' challenges focus on whether the CRA requires registration and disclosure based on speech that that is not actually unambiguously campaign related. Plaintiffs do not, however, argue that the disclosure and registration requirements lack a substantial relation to a sufficiently important governmental interest. Thus, the Court will not address that issue.

1.      **Count VI: "Appeal to Vote" Definition**

Plaintiffs contend CRA's definition of "independent expenditure" as an expenditure for an advertisement "susceptible to no other reasonable interpretation than as an **appeal to vote** for or against a clearly identified candidate or ballot question" is overbroad and vague. § 1-19-26(N)(3)(b) (emphasis added).

First Plaintiffs argue the "appeal to vote" definition is overbroad because it regulates speech other than express advocacy or its functional equivalent. In defining "independent expenditure" New Mexico used very similar language to that used by the Supreme Court in *WRTL-II*: An independent expenditure, subject to the CRA regulation, is an expenditure for an advertisement that "is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question." The only meaningful difference is that New Mexico regulates ads that are an appeal to vote for a candidate *or for a ballot question*. Plaintiffs do not argue that New Mexico can only regulate express advocacy that pertains to a candidate and not a ballot question. To the extent Plaintiffs intended to make this argument, the record is undeveloped, and the issue is not adequately raised.

Instead, Plaintiffs maintain New Mexico's appeal to vote definition is impermissibly broad because it does not contain the temporal, geographic, and medium limitations required under the federal definition of electioneering communication. To make this argument, Plaintiffs rely on a footnote in *WRTL-II*, where the majority, addressing Justice Scalia's dissent, stated, "And keep in mind this test [meaning the functional equivalent test] is only triggered if the speech meets the bright-line requirements of BCRA § 203 in the first place." 551 U.S. at 474 n.7. Plaintiffs read *WRTL-II* as creating a two-part bright line test for when speech is the functional equivalent of express advocacy. Thus, according to Plaintiffs, for speech to be regulated it must first qualify as

an electioneering communication under § 203 of the Bipartisan Campaign Reform Act ("BCRA") and *then* it must also qualify as express advocacy or its functional equivalent.[16]

The Court disagrees with Plaintiffs' strained reading of *WRTL-II*. Aside from this single footnote, Plaintiffs provide no support for their argument that states may only regulate speech that qualifies as express advocacy or its functional equivalent when the speech is distributed via the same mediums and cabined in the same temporal and geographic ways as BCRA. Additionally, nothing in Supreme Court or Tenth Circuit precedent since *WRTL-II* supports this conclusion. In fact, the Supreme Court and Tenth Circuit have endorsed *WRTL-II*'s functional-equivalent test without any reference to the cabining of BCRA's electioneering communications definition. *See e.g.*, *Citizens United*, 558 U.S. at 324–25 ("As explained by THE CHIEF JUSTICE's controlling opinion in *WRTL*, the functional-equivalent test is objective: '[A] court should find that [a communication] is the functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'") (alteration in original); *Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 795 (10th Cir. 2013) ("The controlling opinion in *WRTL* clarified that 'a court should find that an ad is the functional equivalent of express advocacy only if the ad is *susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.*'"). To the extent Plaintiffs argue that the "appeal to vote" definition is overbroad because it does not contain *Buckley*'s "magic words" of express advocacy, this argument has been soundly foreclosed. *Free Speech*, 720 F.3d at 794 (rejecting argument that "express advocacy" cannot extend beyond *Buckley*'s "magic words").

---

[16] Electioneering communications under § 203 of BCRA are limited in terms of medium to "broadcast, cable, or satellite communication that refers to a candidate for federal office," in terms of timing to communications "aired within 30 days of a federal primary election or 60 days of a federal general election," and in terms of geography to communications aired "in the jurisdiction in which that candidate is running for office." *WRTL-II*, 551 U.S. at 457–58.

Finally, Plaintiffs point to a hypothetical they contend illustrates the vagueness and overbreadth of the "appeal to vote" definition. Plaintiffs ask the Court to consider "a communication recognizing legislators for pro-life votes during their previous legislative session distributed before a Christmas gala." **Doc. 281 at 37**. Plaintiffs argue this hypothetical is an example of a communication that would fall under the "appeal to vote" definition even though it contains no express advocacy. The Court is not persuaded for two reasons. First, the Tenth Circuit has explained that the fact some cases will "fall close to the line" of regulation is inevitable and does not render a definition vague or overbroad. *Free Speech*, 720 F.3d at 795–96. Moreover, Plaintiffs' citation to one hypothetical that is arguably close to the line does not mean Plaintiffs have met their burden of demonstrating that the CRA's appeal to vote definition "reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests.*, 455 U.S. at 494. Second, the Court notes that even if the "appeal to vote" definition did—hypothetically—reach some speech not considered express advocacy, New Mexico's registration and disclosure requirements would still be constitutional. *See Indep. Inst. v. Williams*, 812 F.3d 787, 795 (10th Cir. 2016) ("It follows from *Citizens United* that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least some forms of issue speech."); *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 484 (7th Cir. 2012) ("*Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context."); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable."); *see also supra* at page 67–68 (explaining law regarding disclosure and registration requirements).

71

In line with the Tenth Circuit and other circuits, the Court concludes New Mexico's "appeal to vote" definition is neither overbroad nor unconstitutionally vague. *Free Speech*, 720 F.3d at 795–96 (rejecting disclosure overbreadth and vagueness challenges to similar regulatory definition); *see also Yamada v. Snipes*, 786 F.3d 1182, 1190–91 (9th Cir. 2015) (joining "the First, Fourth and Tenth Circuits in holding that the 'appeal to vote' language is not unconstitutionally vague" and concluding that under *WRTL-II* "the 'functional equivalent' or 'appeal to vote' component of this test also meets the imperative for clarity that due process requires") (quotation marks and citations omitted); *Montanans for Cmty. Dev. v. Mangan*, 735 F. Appx. 280, 283 (9th Cir. 2018) (holding Supreme Court foreclosed challenges to "appeal to vote" test by using it in *Citizens United*). Accordingly, Count VI is dismissed with prejudice.

## 2.      Count VII: "Electioneering Communication" Definition

Next, Plaintiffs challenge as overbroad and vague the CRA's definition of "independent expenditure" as an expenditure for an advertisement that "refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot." § 1-19-26(N)(3)(c). Plaintiffs take issue with this definition because they contend it requires disclosure of *all* communications about a candidate or a ballot measure that are made close to an election, regardless of whether the speech qualifies as express advocacy or its functional equivalent and regardless of whether the communication is cabined in terms of medium and number of viewers targeted.

The CRA's definition of "electioneering communication" is very similar to definitions in federal law and Colorado law that have been previously upheld. *See Independence Institute v. Williams*, 812 F.3d 787, 792–97 (10th Cir. 2016) (upholding Colorado electioneering

communication definition); *Citizens United*, 558 U.S. at 318, 369 (upholding disclosure requirements for speech expenditures even if speech "only pertain[s] to a commercial transaction" and does not qualify as express advocacy or its functional equivalent). Thus, the Court concludes the CRA's "electioneering communication" definition is neither overbroad nor vague.

Further, New Mexico's decision to include or exclude various media, including internet communications, from its definition of "independent expenditure" does not render the definition overbroad or vague. *See Citizens United*, 558 U.S. at 326 (explaining it would undermine courts' authority to guess what means of communications are effective for reaching the public, and such line-drawing may be outdated with new technology); *Yamada*, 786 F.3d at 1191 (holding that, regardless of communication's medium, creator of ads had fair notice and disclosure law was not unconstitutionally vague); *Tennant*, 706 F.3d at 283 (concluding there is no constitutional distinction in regulation of print media versus broadcast media); *Ctr. for Indiv. Freedom v. Madigan*, 697 F.3d 464, 492 (7th Cir. 2012) (upholding disclosure law as applied to internet communications).

Finally, to make their point, Plaintiffs direct the Court to yet another hypothetical: "Consider a newsletter from an organization to its supporters, giving a general update on the legislative session. If that newsletter contains an image of the state house floor with legislators in the background, it could still be considered an 'electioneering communication' because the newsletter contains 'a photograph or drawing of the candidate.'" **Doc. 281 at 38** (quoting NMAC 1.10.13.7(C) (defining "clearly identified")). Although the Court doubts that such a communication would fall under the "electioneering communication" umbrella, the Court need not pass on this issue. First, assuming Plaintiffs are correct that their hypothetical involves issue advocacy and would qualify as an electioneering communication, Plaintiffs have provided no

argument as to why the State may not require disclosure or registration for "at least some form of issue speech." *Indep. Inst.*, 812 F.3d at 795 ("It follows from *Citizens United* that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least some forms of issue speech."). Nevertheless, one hypothetical is not enough to carry the Plaintiffs' burden of showing a "substantial number" of the applications of the CRA's definition of "independent expenditure" are "unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387.

The Court concludes the CRA's "electioneering communication" definition is neither vague nor overbroad and **dismisses with prejudice** Plaintiffs' Count VI.

**3.      Count VIII: "Expressly Advocate" Definition**

Plaintiffs' final challenge is to New Mexico's regulatory definition of "expressly advocate," which is used to define "independent expenditure" and thus triggers the registration and disclosure requirements Plaintiffs fear. "Expressly advocate" is defined as follows:

> "Expressly advocate" means that the communication contains a phrase including, but not limited to, "vote for," "re-elect," "support," "cast your ballot for," "candidate for elected office," "vote against," "defeat," "reject," or "sign the petition for," or a campaign slogan or words that in context and with limited reference to external events, such as the proximity to the election, can have no reasonable meaning other than to advocate the election, passage, or defeat of one or more clearly identified ballot questions or candidates.

NMAC 1.10.13.7(I).

This definition is very similar to its federal counterpart. *See* 100 C.F.R. § 100.22. Both definitions employ *Buckley*'s "magic words" for express advocacy and both cover "word(s), which in context have no other reasonable meaning than to urge the election or defeat of . . . candidate(s)." *Id.* Notably, the Tenth Circuit already rejected an overbreadth and vagueness challenge to the similar federal definition. *Free Speech*, 720 F.3d at 794; *see also Nat'l Org. for Marriage v.*

74

*McKee*, 649 F.3d 34, 69 (1st Cir. 2011), *abrogated on other grounds by Bonta*, 141 S. Ct. 2373 (finding "misguided" the "argument that the definition of 'expressly advocate' is vague due to the regulation's reference to consideration of an advertisement's words 'in context'"). The Court likewise rejects Plaintiffs' challenges to New Mexico's definition for similar reasons.

Although the State appears to concede this definition "reach[es] beyond express advocacy to at least some forms of issue speech," the State still contends the definition is constitutional. *Williams*, 812 F.3d at 795. The Court agrees. In *Williams*, the Tenth Circuit concluded, "It follows from *Citizens United* that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least some forms of issue speech." *Id.* Here, even though the expressly advocate definition covers some speech that might not fall under the category of express advocacy, the definition should nevertheless be upheld based on "the public's interest 'in knowing who is *speaking about a candidate* shortly before an election.'" *Id.* at 796 (quoting *Citizens United*, 558 U.S. at 369); *see also Rio Grande Found. v. City of Santa Fe*, 437 F. Supp. 3d, 1051, 1069 (D.N.M. 2020) ("[T]here is a governmental interest in knowing where ballot initiative advocacy money comes from and how it is spent, so citizens have more information about whether special interests are attempting to influence the election.").

Finally, as mentioned twice above, the lack of temporal, geographical, and medium cabining does not render this definition unconstitutionally vague or overbroad. *Free Speech*, 720 F.3d at 794; *Yamada*, 786 F.3d at 1191. The Court holds that the CRA's "expressly advocates" definition is not unconstitutionally vague or overbroad. Count VIII is therefore **dismissed with prejudice**.

## CONCLUSION

The Court **RULES** in favor of Plaintiffs on Count III, IV, and V. Accordingly, the Court **DECLARES** New Mexico's limit on contributions state political parties can make to county political

75

parties unconstitutional because the limit is not supported by a sufficient governmental interest in preventing *quid pro quo* corruption or circumvention of valid limits, **DECLARES** New Mexico's limits on the contributions state political parties can make to candidates unconstitutional because they are not closely drawn to the State's sufficiently important interest, and **ENJOINS** Defendants from enforcing the challenged applications of Sections 1-19-34.7(A)(1), (B), (E). The Court **DISMISSES with prejudice** Counts I, II, VI, VII, VIII, and IX. This Memorandum Opinion and Order accompanies the Court's Findings of Fact and Conclusions of Law filed on the same date for the bench trial on a written record. A separate Final Judgment will be entered under Federal Rule of Civil Procedure 58.

   **IT IS SO ORDERED.**

   _____
   CHIEF UNITED STATES DISTRICT JUDGE

------

**OUT-OF-STATE CONTRIBUTION LIMITS**

[1] Ala. Code. §§ 17-5-1–17-5-21.

[2] Alaska Stat. Ann. § 15.13.070(b)(2) (2021).

[3] Ariz. Rev. Stat. Ann. § 16-912(B) (base limit); *id.* § 16-941(B) (limit reduced by 20%); *id.* § 16-931(A)(2) (limit raised by $100); https://azsos.gov/sites/default/files/2023_2024_Contribution_Limit_Chart_FINAL.pdf.

[4] Ark. Code Ann. § 7-1-201(6) (2021); Ark. Code Ann. § 7-6-203 (2021).

[5] Cal. Gov't Code § 85303(b) (2001); https://fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Documents/2023_Contribution_Limits_Chart_Final.pdf.

[6] Colo. Const. art. XXVIII, § 3 (3)(a) (2002) (establishing base limit); 8 Colo. Code Regs. § 1505-6:10.17.1(d) (2023) (limit adjusted for inflation).

[7] Conn. Gen. Stat. Ann. § 9-612(a) (2021) (limit for individuals over age of 18); Connecticut State Election Enforcement Commission, *Understanding the Connecticut Campaign Finance Laws: A Guide for Party (Town and State Central) Committees*, "Permissible Contributions from

Party Committees" at 12,
https://seec.ct.gov/Portal/data/Publications/Guidebooks/2023PartyCommitteeGuide.pdf.

[8] Del. Code Ann. tit. 15, § 8011 (1990);
https://elections.delaware.gov/campaignfinance/pdfs/contributiontable.pdf.

[9] Fla. Stat. Ann. § 106.08(6)(a) (2023).

[10] Ga. Code Ann. § 21-5-41(j) (2022).

[11] Haw. Rev. Stat. Ann. § 11-360(a) (2010).

[12] Idaho Code Ann. § 67-6610A (2021).

[13] 10 Ill. Comp. Stat. Ann. 5/9-8.5(c) (2022) (base limit); 2023 Contribution Limits,
https://www.elections.il.gov/CampaignDisclosure.aspx?MID=rfZ%2buidMSDY%3d.

[14] Ind. Code Ann. § 3-9-2-5 (1997); https://www.in.gov/sos/elections/files/2023-Campaign-Finance-Manual.FINAL.date-updated.pdf.

[15] Iowa Code Ann. § 68A.501–506; https://ethics.iowa.gov/campaigns/making-contribution-iowa ("Iowa is NOT a state that imposes contribution limit . . . .").

[16] Kan. Stat. Ann. § 25-4153(d) (2012); Kansas Governmental Ethics Commission, *Contribution Limits for State Party Committee*, ethics.ks.gov/CampaignLimits/campaignlimitsstateparty.htm.

[17] Ky. Rev. Stat. Ann. § 121.150(11) (2017); https://kref.ky.gov/Pages/Contribution-Limits.aspx.

[18] La. Stat. Ann. § 18:1505.2K (2020); https://ethics.la.gov/Pub/Laws/cfdasum.pdf.

[19] Me. Rev. Stat. tit. 21-A, §§ 1012 -1020 (no limits on contributions to political parties);
https://www.maine.gov/ethics/political-activity/contributing-information.

[20] Md. Code Ann., Elec. Law § LAW § 13-226(b)(1) (2015);
https://campaignfinance.maryland.gov/Public/ViewReceiptsMain.

[21] 970 Mass. Code Regs. 1.04 (2022); Mass. Gen. Laws Ann. ch. 55, § 6 (2015);
https://www.ocpf.us/Legal/ContributionLimits.

[22] Mich. Comp. Laws Ann. § 169.252a(1) (2013); https://www.michigan.gov/sos/-/media/Project/Websites/sos/CFR-Limits/State-Level-Office-Supreme-Court-Contribution-Limits-Jan2023.pdf?rev=2004d4520be14560802c5d068eef6b7c&hash=93965DDE3D5121DA59FBC614258FF8BF.

[23] Minn. Stat. Ann. § 10A.27 (2021); https://cfb.mn.gov/pdf/camfin/contrib_limits.pdf.

---

[24] Miss. Code Ann §23-15-1021 (limiting contributions to judicial candidates), § 97-13-15 (prohibiting corporations from making contributions).

[25] Mo. Const. Art. VIII, § 23.3(2)(a).

[26] Mont. Code Ann. § 13-37-216(2)(a) (2021); https://politicalpractices.mt.gov/Home/Contribution-Limits.

[27] https://nadc.nebraska.gov/campaign-finance-general-information.

[28] Nev. Const. art. 2 § 10.2 (1996); Nev. Rev. Stat. § 294A.100.1 (2019).

[29] N.H. Rev. Stat. Ann. § 664:4 (IV) (2023).

[30] N.J. Stat. Ann. § 19:44A-11.4.a (2023); https://www.elec.nj.gov/forcandidates/elect_limits.htm.

[31] N.Y. Elec. Law § 14-114.10 (2023); https://www.elections.ny.gov/CFContributionLimits.html#Contributor.

[32] N.C. Gen. Stat. Ann. § 163-278.13(h); North Carolina State Board of Elections "Campaign Finance Manual" at 81, https://s3.amazonaws.com/dl.ncsbe.gov/Campaign_Finance/Campaign-Finance-Manual.pdf.

[33] N.D. Cent. Code §§ 16.1-08.1-01; 16.1-08.1-03.3; 16.1-08.1-03.5(1) (all repealed); https://vip.sos.nd.gov/PortalListDetails.aspx?ptlhPKID=13&ptlPKID=3.

[34] Ohio Rev. Code Ann. § 3517.102(B)(1)(a)(vi) (2019) (setting base limits); https://www.ohiosos.gov/globalassets/candidates/limitchart2023.pdf.

[35] Okla. Stat. Ann. tit. 21, § 187.1 (2015) (explaining that contribution limits are set forth in the Rules of the Ethics Commission); 2022 Oklahoma Annotated Ethics Rule 2.31, http://www.ok.gov/ethics/documents/2022%20Ethics%20ANNOTATED%20Rules%20v2022.1.pdf.

[36] Or. Rev. Stat. Ann. §§ 260.076 - 260.232(explaining reporting requirements but placing no limits on contributions); https://sos.oregon.gov/elections/Documents/campaign-finance.pdf.

[37] 25 Pa. Stat. §§ 3241 – 3260b; https://www.dos.pa.gov/VotingElections/CandidatesCommittees/CampaignFinance/Documents/FAQ/CampaignFinanceFAQ.pdf.

[38] 17 R.I. Gen. Laws Ann. § 17-25-10.1(a)(2) (2017); State of Rhode Island Board of Elections Campaign Finance Manual at 27, https://elections.ri.gov/sites/g/files/xkgbur756/files/2023-05/2023%20Campaign%20Finance%20Manual%20122822%20%281%29.pdf.

[39] S.C. Code Ann. § 8-13-1316(A)(1) (2004); *id.* § 8-13-1314 (2018); https://ethics.sc.gov/campaigns.

[40] S.D. Codified Laws § 12-27-10(1) (2019); https://sdsos.gov/elections-voting/campaign-finance/contribution-limits.aspx.

[41] Tenn. Code Ann. § 2-10-302 (2021) (no limits on contributions to political parties); https://www.tn.gov/tref/tref-candidates/campaign-contribution-limits.html.

[42] Tex. Elec. Code Ann. §§ 253.031 – 253.043; https://www.ethics.state.tx.us/resources/FAQs/2022election_faqs.php#Q1.

[43] Utah Code Ann. § 20A-11-505.5 - 513 (requiring reporting of contributions); https://elections.utah.gov/Media/Default/Documents/Candidate%20Guides/Candidate%20Guide%20Campaign%20Finance.pdf.

[44] Vt. Stat. Ann. tit. 17, § 2941(a)(5)(A) (2015) (base limit); https://outside.vermont.gov/dept/sos/Elections%20Division/campaign%20finance/Campaign%20Finance%20Guide.pdf.

[45] Va. Code Ann. § 24.2-945.2 (2015) (explaining disclosure requirements); Virginia Department of Elections, "Summary of Laws and Policies Candidate Campaign Committees" at 17, https://www.elections.virginia.gov/media/formswarehouse/campaign-finance/2023/Candidate-Summary-2023-06-06.pdf.

[46] Wash. Admin. Code 390-05-400 (2023); https://www.pdc.wa.gov/rules-enforcement/guidelines-restrictions/contribution-limits.

[47] W. Va. Code Ann. § 3-8-5c(b) (2022); West Virginia Secretary of State's Office, "Candidate Campaign Finance Guide," at 3, https://sos.wv.gov/FormSearch/Elections/Campaign_Finance/Campaign%20Finance%20Guide.pdf.

[48] Wis. Stat. Ann. § 11.1101 (2016) (declining to limit contributions from individuals to political parties); https://ethics.wi.gov/Pages/CampaignFinance/ContributionLimits.aspx.

[49] Wyo. Stat. Ann. § 22-25-102(f) (2022); Wyoming Election Division, *2022 Campaign Guide* at 8, http://sos.wyo.gov/Elections/Docs/2022/2022_Campaign_Guide.pdf.

[50] Ala. Code §§ 17-5-1–17-5-21 (Fair Campaign Practices Act).

[51] Alaska Stat. Ann. § 15.13.070(d) (2021).

[52] Ariz. Rev. Stat. Ann. § 16-915(A)(3) (2016) (political party contribution limits); Ariz. Rev. Stat. Ann. § 16-941(B) (base limits reduced by 20%); Ariz. Rev. Stat. Ann. § 16-931(A)(2) (base

raised increased by $100);
https://azsos.gov/sites/default/files/2023_2024_Contribution_Limit_Chart_FINAL.pdf
(contribution limits for 2023-24).

[53] https://fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Documents/2023_Contribution_Limits_Chart_Final.pdf;
Cal. Gov't Code § 85303 (2001) (no limits on contributions by political parties).

[54] Colo. Const. art. XXVIII, § 3 (3)(a) (2002) (establishing base limit); 8 Colo. Code Regs.
§ 1505-6:10.17.1(d) (2023) (limit adjusted for inflation).

[55] Conn. Gen. Stat. Ann. § 9-617(b)(1) (2006); Connecticut State Election Enforcement
Commission, *Understanding the Connecticut Campaign Finance Laws: A Guide for Party (Town
and State Central) Committees*, "Permissible Contributions from Party Committees" at 29,
https://seec.ct.gov/Portal/data/Publications/Guidebooks/2023PartyCommitteeGuide.pdf.

[56] Del. Code Ann. tit. 15, § 8010(b)(1) (1990).

[57] Fla. Stat. Ann. § 106.08(2)(b) (2023).

[58] 10 Ill. Comp. Stat. Ann. 5/9-8.5(b) (2022) (setting primary base rates that adjust with
inflation); "2023 Contribution Limits,"
https://www.elections.il.gov/CampaignDisclosure.aspx?MID=rfZ%2buidMSDY%3d.

[59] Ind. Code Ann. § 3-9-2-5 (1997); https://www.in.gov/sos/elections/files/2023-Campaign-Finance-Manual.FINAL.date-updated.pdf.

[60] Iowa Code Ann. § 68A.501–506; https://ethics.iowa.gov/campaigns/making-contribution-iowa
("Iowa is NOT a state that imposes contribution limit . . . .").

[61] http://ethics.ks.gov/CampaignLimits/campaignlimitsstatewide.htm.

[62] Ky. Rev. Stat. Ann. § 121.150 (2017); https://kref.ky.gov/Pages/Contribution-Limits.aspx.

[63] La. Stat. Ann. § 18:1505.2H(1)(B) (2020).

[64] Mich. Comp. Laws Ann. § 169.252(4) (2016); https://www.michigan.gov/sos/-
/media/Project/Websites/sos/CFR-Limits/State-Level-Office-Supreme-Court-Contribution-
Limits-
Jan2023.pdf?rev=2004d4520be14560802c5d068eef6b7c&hash=93965DDE3D5121DA59FBC6
14258FF8BF.

[65] Minn. Stat. Ann. § 10A.27 (2021); https://cfb.mn.gov/pdf/camfin/contrib_limits.pdf.

[66] Miss. Code Ann §23-15-1021 (limiting contributions individuals or PACs can make to judicial
candidates), § 97-13-15 (prohibiting corporations from making political contributions).

[67] Mont. Code Ann. § 13-37-216(2)(a) (2021);
https://politicalpractices.mt.gov/Home/Contribution-Limits.

[68] https://nadc.nebraska.gov/campaign-finance-general-information.

[69] N.J. Stat. Ann. § 19:44A-11.3 (2023);
https://www.elec.nj.gov/forcandidates/elect_limits.htm#close.

[70] N.Y. Elec. Law § 14-114 (2023);
https://www.elections.ny.gov/CFContributionLimits.html#Contributor.

[71] N.C. Gen. Stat. Ann. § 163-278.13(h); North Carolina State Board of Elections "Campaign
Finance Manual" at 81, https://s3.amazonaws.com/dl.ncsbe.gov/Campaign_Finance/Campaign-
Finance-Manual.pdf.

[72] N.D. Cent. Code §§ 16.1-08.1-01; 16.1-08.1-03.3; 16.1-08.1-03.5(1) (all repealed);
https://vip.sos.nd.gov/PortalListDetails.aspx?ptlhPKID=13&ptlPKID=3.

[73] Ohio Rev. Code Ann. § 3517.102(B)(6)(a)(i) (2019) (setting base limits);
https://www.ohiosos.gov/globalassets/candidates/limitchart2023.pdf.

[74] Or. Rev. Stat. Ann. §§ 260.076 - 260.232(explaining reporting requirements but placing no
limits on contributions); https://sos.oregon.gov/elections/Documents/campaign-finance.pdf.

[75] 25 Pa. Stat. §§ 3241 – 3260b;
https://www.dos.pa.gov/VotingElections/CandidatesCommittees/CampaignFinance/Documents/
FAQ/CampaignFinanceFAQ.pdf.

[76] S.C. Code Ann. § 8-13-1316(A)(1) (2004); https://ethics.sc.gov/campaigns.

[77] S.D. Codified Laws § 12-27-7(4) (2019); https://sdsos.gov/elections-voting/campaign-
finance/contribution-limits.aspx.

[78] Tenn. Code Ann. § 2-10-306(a)(1) (2011); https://www.tn.gov/tref/tref-candidates/campaign-
contribution-limits.html.

[79] Tex. Elec. Code Ann. §§ 253.031 – 253.043;
https://www.ethics.state.tx.us/resources/FAQs/2022election_faqs.php#Q1.

[80] Utah Code Ann. § 20A-11-505.5 - 513 (requiring reporting of contributions);
https://elections.utah.gov/Media/Default/Documents/Candidate%20Guides/Candidate%20Guide
%20Campaign%20Finance.pdf.

[81] Vt. Stat. Ann. tit. 17, § 2941 (2015) ("[A] candidate may accept unlimited contributions from a
political party.");

https://outside.vermont.gov/dept/sos/Elections%20Division/campaign%20finance/Campaign%20Finance%20Guide.pdf.

[82] Va. Code Ann. § 24.2-945.2 (2015) (explaining disclosure requirements but placing no limits on contributions); Virginia Department of Elections, "Summary of Laws and Policies Candidate Campaign Committees" at 17, https://www.elections.virginia.gov/media/formswarehouse/campaign-finance/2023/Candidate-Summary-2023-06-06.pdf.

[83] Wash. Admin. Code 390-05-400.405(4) (2023); https://www.pdc.wa.gov/sites/default/files/2023-04/2023%20voter%20count%20contribution%20limits%20UPDATED%20VALUES%20COPY.pdf; https://www.pdc.wa.gov/rules-enforcement/guidelines-restrictions/contribution-limits.

[84] Wis. Stat. Ann. § 11.1101 (2016) (declining to limit contributions parties can make to candidates); https://ethics.wi.gov/Pages/CampaignFinance/ContributionLimits.aspx.

[85] Wyo. Stat. Ann. § 22-25-102 (2022); Wyoming Election Division, *2022 Campaign Guide* at 8, http://sos.wyo.gov/Elections/Docs/2022/2022_Campaign_Guide.pdf.

[86] Okla. Stat. Ann. tit. 21, § 187.1 (2015) (explaining that contribution limits are set forth in the Rules of the Ethics Commission); 2022 Oklahoma Annotated Ethics Rule 2.32, http://www.ok.gov/ethics/documents/2022%20Ethics%20ANNOTATED%20Rules%20v2022.1.pdf.

[87] 17 R.I. Gen. Laws Ann. § 17-25-10.1(a)(2)(e) (2017); State of Rhode Island Board of Elections Campaign Finance Manual at 27, https://elections.ri.gov/sites/g/files/xkgbur756/files/2023-05/2023%20Campaign%20Finance%20Manual%20122822%20%281%29.pdf.

[88] Ark. Code Ann. § 7-6-203(i) (2021). This limit will increase to $3,300. *See* 2023 Arkansas Laws Act 307 (S.B. 280) (explaining that Arkansas Ethics Commission will set maximum campaign contribution limit). The Arkansas Ethics Commission proposed a contribution increase, which will take effect November 2023. *See* https://www.arkansasethics.com/wp-content/uploads/2023/05/Rules-on-Campaign-Contribution-Limit-Mark-Up.pdf.

[89] Ga. Code Ann. § 21-5-41(a) (2022) (base rates for statewide offices); https://ethics.ga.gov/contribution-limits/ (current rates adjusted for inflation).

[90] Haw. Rev. Stat. Ann. § 11-357 (2010).

[91] Idaho Code Ann. § 67-6610A(2) (2021).

[92] Me. Rev. Stat. tit. 21-A, § 1015.2-B (2023); https://www.maine.gov/ethics/political-activity/contributing-information.

[93] Md. Code Ann., Elec. Law § 13-227 (2014); https://elections.maryland.gov/campaign_finance/summaryguide/Contributions_and_Transfers_Limit_Chart.pdf.

[94] 970 Mass. Code Regs. 1.04 (2022); Mass. Gen. Laws Ann. ch. 55, § 6 (2015); https://www.ocpf.us/Legal/ContributionLimits.

[95] Mo. Const. Art. VIII, § 23.3(1)(a) (establishing base limit, which adjusts for inflation).

[96] Nev. Const. art. 2 § 10.2 (1996); Nev. Rev. Stat. § 294A.100.1 (2019).

[97] N.H. Rev. Stat. Ann. § 664:4(IV) (2023).

[98] W. Va. Code Ann. § 3-8-5c(a)(1) (2022); West Virginia Secretary of State's Office, "Candidate Campaign Finance Guide," at 6, https://sos.wv.gov/FormSearch/Elections/Campaign_Finance/Campaign%20Finance%20Guide.pdf.

[99] Ala. Code. §§ 17-5-1–17-5-21 (Fair Campaign Practices Act).

[100] Alaska Stat. Ann. § 15.13.070(d) (2021).

[101] Ariz. Rev. Stat. Ann. § 16-915(A) (2016) (base limits); Ariz. Rev. Stat. Ann. § 16-941(B) (base limits reduced by 20%); Ariz. Rev. Stat. Ann. § 16-931(A)(2) (base raised increased by $100); https://azsos.gov/sites/default/files/2023_2024_Contribution_Limit_Chart_FINAL.pdf  (2023-24 limits).

[102] Ark. Code Ann. § 7-6-203(i) (2021). This limit will increase to $3,300. *See* 2023 Arkansas Laws Act 307 (S.B. 280) (explaining that Arkansas Ethics Commission will set maximum campaign contribution limit). The Arkansas Ethics Commission proposed a contribution increase, which will take effect November 2023. https://www.arkansasethics.com/wp-content/uploads/2023/05/Rules-on-Campaign-Contribution-Limit-Mark-Up.pdf.

[103] https://fppc.ca.gov/content/dam/fppc/NS-Documents/TAD/Campaign%20Documents/2023_Contribution_Limits_Chart_Final.pdf.

[104] Colo. Const. art. XXVIII, § 3 (3)(a) (2002) (establishing base limit); 8 Colo. Code Regs. § 1505-6:10.17.1(d) (2023) (limit adjusted for inflation).

[105] Conn. Gen. Stat. Ann. § 9-617(b)(1)(A)-(E) (2006); Connecticut State Election Enforcement Commission, *Understanding the Connecticut Campaign Finance Laws: A Guide for Party (Town and State Central) Committees*, "Permissible Contributions from Party Committees" at 29, https://seec.ct.gov/Portal/data/Publications/Guidebooks/2023PartyCommitteeGuide.pdf.

[106] Del. Code Ann. tit. 15, § 8010(b) (1990).

[107] Fla. Stat. Ann. § 106.08(2)(b) (2023).

[108] Ga. Code Ann. § 21-5-41(a), (b) (2022) (base rates for statewide and all other offices); https://ethics.ga.gov/contribution-limits/ (current rates adjusted for inflation).

[109] Haw. Rev. Stat. Ann. § 11-357 (2010).

[110] Idaho Code Ann. § 67-6610A(2) (2021).

[111] 10 Ill. Comp. Stat. Ann. 5/9-8.5(b) (2022) (setting primary base rates that adjust with inflation); "2023 Contribution Limits," https://www.elections.il.gov/CampaignDisclosure.aspx?MID=rfZ%2buidMSDY%3d (current limits).

[112] Ind. Code Ann. § 3-9-2-5 (1997); https://www.in.gov/sos/elections/files/2023-Campaign-Finance-Manual.FINAL.date-updated.pdf.

[113] Iowa Code Ann. § 68A.501–506; https://ethics.iowa.gov/campaigns/making-contribution-iowa ("Iowa is NOT a state that imposes contribution limit . . . .").

[114] Kan. Stat. Ann. § 25-4153(g) (2012); https://ethics.kansas.gov/campaign-finance/contribution-limits/.

[115] Ky. Rev. Stat. Ann. § 121.150 (2017); https://kref.ky.gov/Pages/Contribution-Limits.aspx.

[116] La. Stat. Ann. § 18:1505.2H(1)(B) (2020).

[117] Me. Rev. Stat. tit. 21-A, § 1015.2-B (2023); https://www.maine.gov/ethics/political-activity/contributing-information.

[118] Md. Code Ann., Elec. Law § 13-227 (2014); https://elections.maryland.gov/campaign_finance/summaryguide/Contributions_and_Transfers_Limit_Chart.pdf.

[119] 970 Mass. Code Regs. 1.04 (2022); Mass. Gen. Laws Ann. ch. 55, § 6 (2015); https://www.ocpf.us/Legal/ContributionLimits.

[120] Mich. Comp. Laws Ann. § 169.252 (2016); https://www.michigan.gov/sos/-/media/Project/Websites/sos/CFR-Limits/State-Level-Office-Supreme-Court-Contribution-Limits-Jan2023.pdf?rev=2004d4520be14560802c5d068eef6b7c&hash=93965DDE3D5121DA59FBC614258FF8BF; https://www.michigan.gov/sos/-/media/Project/Websites/sos/CFR-Limits/Lower-Court-Judicial-Office-Contribution-Limits-Jan2023.pdf?rev=46994717686d422b83ba069218cfb3d3&hash=E4A567AC3CD2C1CEBC31C4214BE7419A; https://www.michigan.gov/sos/-/media/Project/Websites/sos/CFR-Limits/Local-Level-Office-Contribution-Limits-

Jan2023.pdf?rev=47882cf7bff54084a022df2ed123e0cc&hash=A1B67834D56CF1BA461E2859 98A1F9C6.

121 Minn. Stat. Ann. § 10A.27 (2021); https://cfb.mn.gov/pdf/camfin/contrib_limits.pdf.

122 Miss. Code Ann §23-15-1021 (limiting contributions individuals or PACs can make to judicial candidates), § 97-13-15 (prohibiting corporations from making political contributions).

123 Mo. Const. art. VIII § 23.3(1)(a); "What are the contribution limits for candidates in Missouri?" https://www.mec.mo.gov/FAQ/Questions/24.

124 Mont. Code Ann. § 13-37-216(2)(a) (2021); https://politicalpractices.mt.gov/Home/Contribution-Limits.

125 https://nadc.nebraska.gov/campaign-finance-general-information.

126 Nev. Const. art. 2 § 10.2 (1996); Nev. Rev. Stat. § 294A.100.1 (2019).

127 N.H. Rev. Stat. Ann. § 664:4 (V) (2023).

128 N.J. Stat. Ann. § 19:44A-11.3 (2023); https://www.elec.nj.gov/forcandidates/elect_limits.htm#close.

129 N.Y. Elec. Law § 14-114 (2023); https://www.elections.ny.gov/CFContributionLimits.html#Contributor.

130 N.C. Gen. Stat. Ann. § 163-278.13(h); North Carolina State Board of Elections "Campaign Finance Manual" at 81, https://s3.amazonaws.com/dl.ncsbe.gov/Campaign_Finance/Campaign-Finance-Manual.pdf.

131 N.D. Cent. Code §§ 16.1-08.1-01; 16.1-08.1-03.3; 16.1-08.1-03.5(1) (all repealed); https://vip.sos.nd.gov/PortalListDetails.aspx?ptlhPKID=13&ptlPKID=3.

132 Ohio Rev. Code Ann. § 3517.102(B)(6)(a)(vi) (2019) (setting base limits); https://www.ohiosos.gov/globalassets/candidates/limitchart2023.pdf.

133 Okla. Stat. Ann. tit. 21, § 187.1 (2015) (explaining that contribution limits are set forth in the Rules of the Ethics Commission); 2022 Oklahoma Annotated Ethics Rule 2.32, http://www.ok.gov/ethics/documents/2022%20Ethics%20ANNOTATED%20Rules%20v2022.1.pdf.

134 Or. Rev. Stat. Ann. §§ 260.076 - 260.232(explaining reporting requirements but placing no limits on contributions); https://sos.oregon.gov/elections/Documents/campaign-finance.pdf.

[135] 25 Pa. Stat. §§ 3241 – 3260b; https://www.dos.pa.gov/VotingElections/CandidatesCommittees/CampaignFinance/Documents/FAQ/CampaignFinanceFAQ.pdf.

[136] 17 R.I. Gen. Laws Ann. § 17-25-10.1(a)(2)(e) (2017); State of Rhode Island Board of Elections Campaign Finance Manual at 27, https://elections.ri.gov/sites/g/files/xkgbur756/files/2023-05/2023%20Campaign%20Finance%20Manual%20122822%20%281%29.pdf.

[137] S.C. Code Ann. § 8-13-1316(A) (2004); https://ethics.sc.gov/campaigns.

[138] S.D. Codified Laws § 12-27-7(4) (2019); id. § 12-27-8(4); https://sdsos.gov/elections-voting/campaign-finance/contribution-limits.aspx.

[139] Tenn. Code Ann. § 2-10-306(a) (2011); https://www.tn.gov/tref/tref-candidates/campaign-contribution-limits.html.

[140] Tex. Elec. Code Ann. § 253.155 (2019) (describing limits on contributions to judicial candidates, but not limiting the contributions political parties can make); https://www.ethics.state.tx.us/resources/FAQs/2022election_faqs.php#Q1.

[141] Utah Code Ann. § 20A-11-505.5 - 513 (requiring reporting of contributions); https://elections.utah.gov/Media/Default/Documents/Candidate%20Guides/Candidate%20Guide%20Campaign%20Finance.pdf.

[142] Vt. Stat. Ann. tit. 17, § 2941 (2015) ("[A] candidate may accept unlimited contributions from a political party."); https://outside.vermont.gov/dept/sos/Elections%20Division/campaign%20finance/Campaign%20Finance%20Guide.pdf.

[143] Va. Code Ann. § 24.2-945.2 (2015) (explaining disclosure requirements but placing no limits on contributions); see also Virginia Department of Elections, "Summary of Laws and Policies Candidate Campaign Committees" at 17, https://www.elections.virginia.gov/media/formswarehouse/campaign-finance/2023/Candidate-Summary-2023-06-06.pdf.

[144] Wash. Admin. Code 390-05-400.405(4) (2023); https://www.pdc.wa.gov/sites/default/files/2023-04/2023%20voter%20count%20contribution%20limits%20UPDATED%20VALUES%20COPY.pdf; https://www.pdc.wa.gov/rules-enforcement/guidelines-restrictions/contribution-limits.

[145] W. Va. Code Ann. § 3-8-5c(a)(1) (2022);West Virginia Secretary of State's Office, "Candidate Campaign Finance Guide," at 6, https://sos.wv.gov/FormSearch/Elections/Campaign_Finance/Campaign%20Finance%20Guide.pdf.

---

[146] Wis. Stat. Ann. § 11.1101 (2016) (declining to limit contributions parties can make to candidates); https://ethics.wi.gov/Pages/CampaignFinance/ContributionLimits.aspx.

[147] Wyo. Stat. Ann. § 22-25-102(f) (2022); Wyoming Election Division, *2022 Campaign Guide* at 8, http://sos.wyo.gov/Elections/Docs/2022/2022_Campaign_Guide.pdf.